ITT CONTINENTAL BAKING CO., PLAINTIFF, v. TOWNSHIP OF
EAST BRUNSWICK, DEFENDANT.

Tax Court of New Jersey

April 2, 1980.

*John E. Garippa* for plaintiff.

*Malcolm Busch* for defendant.

ANDREW, J. T. C.

Plaintiff seeks review of the judgments of the Middlesex County Board of Taxation for the tax years 1976, 1977 and 1978. It contends that its property is assessed in excess of its fair market value and also that its assessment is at a higher percentage of true value than are other assessments in the taxing district on other properties, and thus exceeds the common level of assessments in the taxing district. The premises are located in the Township of East Brunswick and are known as Block 32, Lot 1–16, Tices Lane. The improvements which were constructed by plaintiff have been used by the ITT Continental Baking Co. for baking purposes since construction in 1970. The original assessment of the subject property for each of the tax years in question was as follows:

| | |
|---|---|
| Land | $ 547,600 |
| Improvements | 2,340,500 |
| Total | $2,888,100 |

This assessment was affirmed by the Middlesex County Board of Taxation for each of the tax years, to wit, 1976, 1977 and 1978.

The subject of this proceeding consists of land with all municipal improvements and services and is approximately 34.718 acres, with improvements consisting of three buildings which are utilized for production of baking goods, engineering research, a repair shop, truck wash and a thrift store, along with warehousing. The main building is primarily a one–story manufacturing improvement which houses the bakery production area, offices and warehouse. The main building consists of a concrete slab foundation, steel post and girder supporting steel deck concrete roof covered with tar and stone; aluminum coping facade; primarily concrete floors with some portions having maple floor and asphalt vinyl tile covering; fluorescent lighting fixtures and suspended blower units for heat. The entire plant is sprinklered. A mezzanine is located in the middle of the plant and

extends across the entire width of the building. This area is fully air–conditioned and has a cafeteria, ladies' and men's locker rooms and lavatories. There is a third–floor, air–conditioned office along the front elevation. It contains a large open office, two executive type offices and a small cafeteria room as well as a men's room and ladies' room.

The second improvement, identified as the mechanical research building, is a one–story brick building containing a small air–conditioned office area finished with asphalt vinyl tile floors, a drop ceiling, fluorescent lights, a large open office area and three small offices, along with a small cafeteria, locker room, men's room and ladies' room. The balance of the building is utilized as an equipment repair and research area and is industrial space similar to the main building.

The third improvement is a one–story brick building which contains an air–conditioned retail store, a garage, warehouse and truck wash. The retail store is finished with asphalt vinyl tile floors, a drop ceiling, fluorescent lights and an aluminum–set store window. The balance of this building is unfinished and is generally of the same construction as the main building with the exception that there is no sprinkler. The subject improvements were originally constructed in 1970 with an addition in 1972.

Each party relied on the testimony of one expert in order to establish the value of the subject property. The expert for the taxpayer indicated that the value at which he arrived was $2,765,000 by means of the cost approach, $2,700,000 by means of the income approach and $2,700,000 by means of the market data approach. His correlated value was $2,700,000, allocated as follows:

| | |
|---|---|
| Land | $ 555,000 |
| Improvements | 2,145,000 |
| Total | $2,700,000 |

The expert for the taxing district indicated that the only method he utilized in order to value this property was by the cost approach. His reasoning was that this was a special pur-

pose building in that the production facility and the real estate had been blended into a functional unit as a bakery. Since he could find no sales of operating bakeries, he felt that the market data approach could not be utilized. By the same token, since he could not find any leases of bakeries, he felt that the income approach could not be utilized. By using only the cost approach, he determined the value of the subject property to be $3,900,000 for each of the years under appeal.

Because of the view that I have taken of this matter, it is unnecessary to decide whether the improvements constitute a unique or special purpose property such as was found in *Anaconda Co. v. Perth Amboy*, 157 *N.J.Super.* 42, 384 *A.2d* 531 (App. Div.1978) (a copper refinery), and *Bostian v. Franklin State Bank*, 167 *N.J.Super.* 564, 401 *A.2d* 549 (App.Div.1979) (a bank), requiring the use of the cost approach as the only proper appraisal approach to value.

▉▉▉ As previously stated, both experts utilized the cost approach to value. They also both relied upon the [1979] *Marshall Valuation Service, Marshall & Swift*, but differed in estimated value due to their utilization of different basic building classifications as found in *Marshall & Swift* and also in their allowances for economic obsolescence. The taxpayer's expert determined that the subject improvements fit the basic classification of a Class C building found on page C9 of *Marshall & Swift*, while the expert for the taxing district believed that the proper classification would be Class A as found in section 14, page 11 of *Marshall & Swift*. The primary characteristic of a Class A building is "fire proof structural steel frame," while the main feature of Class C is "masonry or reinforced concrete." On cross–examination the expert for the township indicated there was structural steel in the improvements, but he did not know where or the percentage of such material used in the subject. It was conceded that the difference in value produced by the differing classifications was substantial, *i. e.*, approximately 27%. Although experience and judgment are necessary in the determination of a particular classification, the class of a

building must primarily be determined upon the building specifications given for the class. *Real Property Appraisal Manual for New Jersey Assessors* I–77 (3rd ed. 1978). The taxing district's expert's testimony with regard to the primary specifications of a Class A classification was vague, incomplete and nonpersuasive. Accordingly, based upon this and the uncontroverted description rendered by the taxpayer, I find the improvements to be properly identified as Class C. However, this does not indicate that I have accepted the cost valuation as presented by the taxpayer.

The second area of difference in the cost approach was with regard to economic obsolescence. The taxpayer's expert found 10% economic obsolescence while the taxing district's expert opined that there was no economic obsolescence.

Economic (also referred to as environmental or locational) obsolescence is a loss in value resulting from factors outside the improvements, such as environment, changes in zoning regulations or a declining neighborhood economy. *Bostian v. Franklin State Bank, supra* at page 573, 401 *A.*2d 549, *American Institute of Real Estate Appraisers, The Appraisal of Real Estate* (7th ed. 1978), at pp. 258, 259. It represents anything outside the property lines that would cause the property to have less appeal or marketability. The taxpayer's expert allowed $245,554 (representing 10%) for a loss in value due to economic obsolescence. It was his opinion that it would take time to market the improvements because of size, and during this period costs such as maintenance, heating, security and property taxes would be incurred. He stated that this was a generally accepted approach and he allowed 10% for this element of depreciation. It was the opinion of the expert for the taxing district that there was no economic obsolescence because the concept of economic obsolescence has nothing to do with the size of the property or how long it would take to market. He felt that the period involved in selling property does not constitute economic obsolescence since this would be true with all property in varying degrees. I agree.

I do not believe that the time to market a property can be considered in valuing realty for local property taxation. The value to be determined is as of October 1 of the pretax year, a specified date. *N.J.S.A.* 54:4–23. The question is, what would the property sell for at a bona fide sale on October 1? *Ibid.* The period of time it would take to sell realty does not enter into a determination of value as of the specified date. I find no support for the taxpayer's proposition in the definition of the term economic obsolescence, nor do I find support in the appropriate tax statutes. In addition, I find that such an allowance is unsupported by any proof as to the period of time it would take to market the subject property. I find the allowance to be speculative, remote and unconvincing. If the allowance given for economic obsolescence were added back to the taxpayer's expert's valuation under the cost approach it would produce a value of $3,010,554 ($2,765,000 value by cost approach plus $245,554 economic obsolescence), or $3,010,000 rounded.

The taxpayer's expert also used the income and market approaches which produced value estimates of $2,700,000. In the income approach the expert relied upon four comparable rentals which ranged from $1.33 to $1.60 a square foot. He selected the bottom of the range at $1.35 a square foot as constituting economic rent. It was shown that the subject was a light manufacturing industrial facility while all four comparable rentals were warehouses. The taxpayer's expert admitted that generally warehouses have lower values than do industrial buildings. The taxing district's expert indicated this is because a warehouse is a "bare bones building with very little finish that does not require heating facilities." The general purpose of a warehouse is to provide a manufacturer or distributor of merchandise a place to store his goods temporarily pending delivery to a retailer or customer. There would be no need to construct an industrial light manufacturing facility for the purpose of the storage of goods. The taxpayer's expert further admitted that the three comparables located in the area of the subject were considerably smaller in land size than the subject, and that he did not consider the excess land of the subject in his valuation.

He offered little to explain why he selected an economic rental at the lower end of his scale of rentals rather than the upper end. If he had selected a rental of $1.50 per square foot along with all of the expert's allowances for vacancies, expenses and capitalization rate, which were all uncontroverted, it would produce a value of $3,045,000 rounded. This result would be in substantial accord with the result produced by the cost approach if economic obsolescence is disallowed.

With regard to the market approach, the taxpayer's expert relied upon five sales which indicated to him a unit value of $11 a square foot of building area, which produced a value of $2,700,000 ($11.00 × 246,488 rounded). The sales ranged from $10 a square foot to $12.26 per square foot. It must be noted that the appraiser indicated that one comparable (his sale number 2) which sold in June 1975 for $10.00 per square foot resold in August 1976 for $15.02 per square foot but he did not consider the resale. His reason for not considering this resale was because it occurred after the assessment date of October 1, 1975. This explanation is inadequate since there were three tax years to consider (1976, 1977 and 1978) and secondly, he used two other sales that occurred after the date of the resale. Of the sales used I find that sale number 1 and sale number 4 are the most comparable. This is based on age of the improvements, location and size of land areas. These comparables produce a unit price per square foot of $12.26. This unit price is also supported by averaging the unit prices of all the comparables if I ignore the sale of comparable number 2 for $10.00 per square foot and consider its resale for $15.02 per square foot. Utilizing $12.26 per square foot will produce a value of $3,022,000 rounded ($12.26 × 246,488) which again is in substantial accord with the result produced by the taxpayer's expert's cost approach if economic obsolescence is ignored.

It is conceded that there is no single doctrinaire approach to the valuation of real property. *Samuel Hird & Sons, Inc. v. Garfield*, 87 *N.J.Super.* 65, 72, 208 *A.2d* 153, 157 (App.Div. 1965). The search is for the true value of the property, specifi-

cally the price a hypothetical willing buyer would pay a hypothetical willing seller. *New Brunswick v. Division of Tax Appeals*, 39 *N.J.* 537, 189 *A.2d* 702 (1963). *New Brunswick* indicated that there is no rigid rule and that consideration may be given to the three traditional approaches to value. In a particular case one approach may predominate in an expert's opinion. It is felt that the cost approach supported by the income approach and market data approach should predominate in this case, not because the property is a unique, one of a kind, special purpose entity but rather because the proofs adduced by means of the cost approach I find more reliable. This is due to the difficulties in comparing industrial with warehouse space in the income approach, and comparing industrial sites without sufficient supporting adjustment data in the market data approach. Whenever the income or market approaches require speculation as to comparable rentals or adjustments for size, time, etc., these methods lose their charm and beckon to an alternative valuation technique. Therefore, I find the value of the subject to be $3,010,000. I have accepted the land value as presented by the taxpayer's expert at $555,000 since the proofs adduced by the taxpayer were sufficient to overcome the presumption of correctness of the county board judgment and represented the only opinion as to land value supported by sales of comparable property.

The allocation of the value therefore shall be as follows:

| | |
|---|---|
| Land | $ 555,000 |
| Improvements | 2,455,000 |
| Total | $3,010,000 |

Plaintiff has also raised the issue of inequality in assessment and has presented a summary of the State Director's sales—ratio study for East Brunswick, New Jersey, for the tax years in question. The statistics indicated that the Director's ratios (average weighted classified ratios) were:

| | | |
|---|---|---|
| 1976 | – | 95.47 |
| 1977 | – | 90.50 |
| 1978 | – | 87.31 |

■ It was disclosed that the last revaluation occurred in East Brunswick in 1963, but there had been a reassessment in 1973. I have reviewed the statistical material and based upon the ratio clusters overall, by class and by year, along with the coefficients of deviation overall, stratified by class and segmented by class, conclude that there was a common level of assessment. This common level, however, was not 100%. The township has not disputed this. There is insufficient evidence in the present record for this court to make a determination as to whether the better indicator of a common level in the taxing district is the unweighted, unclassified Director's ratio or the weighted, classified Director's ratio. Inasmuch as the weighted, classified Director's ratio has received judicial acceptance as the method by which to remedy discrimination in assessment, this court will consider the average weighted, classified Director's ratio. *In re Appeal of Kents, 2124 Atlantic Avenue, Inc.*, 34 *N.J.* 21, 32, 166 *A.2d* 763 (1961). I find that the common level of assessment for the tax years in question based on the Director's average ratio was 91.09%, or an average of the three years under appeal. *New Brunswick v. Division of Tax Appeals, supra,* 39 *N.J.* at 541, 189 *A.2d* 702; *Feder v. Passaic,* 105 *N.J.Super.* 157, 162, 251 *A.2d* 457 (App.Div.1969). Based on the value which I have determined, plaintiff is being assessed at a ratio of 95.9%. This ratio is not substantially in excess of the Director's average ratio for the years in question and therefore I find no basis for discrimination relief. *In re Appeal of Kents, 2124 Atlantic Ave., Inc., supra; Piscataway Associates v. Piscataway Tp.,* 73 *N.J.* 546, 554, 376 *A.2d* 527 (1977).

■ However, this matter does not end at this point because consideration must be given to *N.J.S.A.* 54:2–40.4, commonly referred to as Chapter 123. Pursuant to this statute the Tax Court must for the tax year 1978 utilize the unweighted, unclassified, arithmetic average as the guidepost for the common level range remedy enacted by the Legislature. *N.J.S.A.* 54:1–35a. The court must be satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the

common level range (that range which is plus or minus 15% of the State Director's unweighted, unclassified, arithmetic average ratio for the taxing district). If the assessment ratio of the subject property does exceed or fall below the common level range, then the court shall revise the assessment by applying the average ratio to the true value of the property. *N.J.S.A.* 54:2–40.4. The unweighted, unclassified, arithmetic ratio for the Township of East Brunswick for 1978 was 81%. The lower limit was 69% while the upper limit was 94%. Since the assessment ratio for the subject property based on a true value of $3,010,000 is 95.9%, the assessment must be revised by applying the average ratio to the true value of the property. Applying the arithmetic ratio of 81% produces an assessment of $2,438,100 allocated as follows:

| Land | $ 449,550 |
|---|---|
| Improvements | 1,988,550 |
| Total | $2,438,100 |

It is, therefore, the judgment of this court that the petitions for 1976 and 1977 be dismissed and that the assessment for 1978 be reduced to $2,438,100 allocated as previously stated.

Judgment will be entered by the Clerk of the Tax Court.