**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

October 3, 2022

James T. Ryan, III, Esq.
Stavitsky & Associates, LLC
350 Passaic Avenue
Fairfield, New Jersey 07004

Joseph J. McGlone, Esq.
O'Toole Scrivo, LLC
14 Village Park Road
Cedar Grove, New Jersey 07009

      Re:    <u>Carant LP v. West Caldwell Township</u>
               Docket Nos. 007541-2018, 002803-2019, 008467-2020, and 004882-2021

Dear Mr. Ryan and Mr. McGlone:

This letter shall constitute the court's opinion following trial of the local property tax appeals instituted by plaintiff, Carant LP ("Carant"). Carant challenges the 2018, 2019, 2020, and 2021 tax year assessments on its unimproved property located in West Caldwell Township ("West Caldwell").

For the reasons stated more fully below, the court affirms the 2018, 2019, 2020, and 2021 tax year assessments.

## I.   <u>Findings of Fact</u>

Pursuant to <u>R.</u> 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony presented during trial.

### A.   <u>The subject property</u>

Carant is the owner of the unimproved real property located at 1200 Bloomfield Avenue, West Caldwell, Essex County, New Jersey (the "subject property"). The subject property is






identified on West Caldwell's municipal tax map as block 1700, lot 2. The subject property is situated along the south side of Bloomfield Avenue between Fairfield Township and Johnson Avenue, approximately 366 feet east of the Fairfield Township and West Caldwell Township border. As of the valuation dates, the subject property comprised a rectangular shaped, unimproved lot containing 1.72-acres or 75,000 square feet of land. The subject property has approximately 150 feet of frontage along Bloomfield Avenue, and a depth of approximately 500 feet. The subject property is bordered on its east and west by automobile dealerships.

As of the valuation dates, the subject property was in West Caldwell's B-3 General Business zoning district. Permitted uses in the B-3 General Business zoning district include: (a) the retail sale, display, or rental on the premises of commodities or services predominantly to the ultimate consumer; (b) office and professional buildings; and (c) restaurants.

Conflicting testimony was offered regarding the subject property's Special Flood Hazard Zone designation. According to Carant's expert (as defined herein), the subject property is in Special Flood Hazard Area AE, possessing a "1-percent annual chance [of] flood[ing] . . . or 100-year flood," and requiring flood insurance.[1] However, according to West Caldwell's expert (as defined herein), the subject property is principally located in Special Flood Hazard Area X, with a "small portion of the rear" section of the subject property in Special Flood Hazard Area AE-5.[2]

Carant timely filed complaints with the Tax Court challenging the subject property's 2018, 2019, 2020, and 2021 tax year assessments. West Caldwell did not file any counterclaims.

---

[1] https://www.fema.gov/glossary/flood-zones.

[2] The court's review of the flood hazard maps annexed to Carant's expert's report and West Caldwell's expert's report, discloses that the subject property is principally excluded from the "floodway" designation. Therefore, the court finds West Caldwell's expert's Special Flood Hazard Zone designation to be more accurate. However, the subject property's location in either Special Food Hazard Area X or AE does not impact the court's value determination.

   

B.    The experts

During trial, Carant and West Caldwell each offered testimony from a New Jersey certified general real estate appraiser, who were each accepted by the court as experts in the field of real property valuation (referred to collectively as the "experts," or individually as "Carant's expert," or "West Caldwell's expert").  Each expert prepared an appraisal report containing photographs of the subject property and expressing opinions of the subject property's true or fair market value.  As of each valuation date, the subject property's local property tax assessment, implied equalized value, and the experts' value conclusions are set forth below:

| Valuation date | Tax assessment | Average ratio of assessed to true value | Implied equalized value | Carant's expert's value opinion | West Caldwell's expert's value opinion |
|---|---|---|---|---|---|
| 10/1/2017 | $1,875,000 | 90.48% | $2,072,281 | $1,340,000 | $2,625,000 |
| 10/1/2018 | $1,875,000 | 89.59% | $2,092,868 | $1,340,000 | $2,625,000 |
| 10/1/2019 | $1,875,000 | 90.63% | $2,068,851 | $1,340,000 | $2,625,000 |
| 10/1/2020 | $1,875,000 | 91.00% | $2,060,440 | $1,340,000 | $2,625,000 |

C.    Site plan approval, minor subdivision approval, and building permit

In or about 2013, Carant received final site plan and minor subdivision approvals from the West Caldwell Planning Board.  The minor subdivision approval contemplated the conveyance of approximately 80,114 square feet of the adjacent rear property (identified as block 1700, lot 10) and its merger with the subject property (block 1700, lot 2).[3]  Following the subdivision, the site plan approval envisioned construction of a one and part two-story retail/office building containing

---

[3]  The minor subdivision map, bearing the stamp "Approved" and annexed to Carant's expert's appraisal report, discloses the proposed conveyance of approximately 80,114 square feet from block 1700, lot 10 and its merger with the subject property.  However, no evidence or testimony was offered that said conveyance and merger was undertaken.  Instead, during trial, the experts each offered testimony and evidence that the subject property comprises 75,000 square feet of vacant land.






24,170 square feet of leasable area, to be known as "Cobblestone Plaza" (the "Project").[4]

On or about October 28, 2016, West Caldwell furnished Carant with a copy of the duly executed Developer's Agreement between Carant and West Caldwell for the subject property. Thereafter, in late 2016, Carant commenced site work on the subject property including grading, curbing, and construction of a detention basin.[5]

However, a dispute subsequently arose between West Caldwell and Carant involving the use or installation of asphalt millings on the subject property, resulting in the cessation of construction. Carant alleged that the curbing involved installation of a "4-inch-thick subbase comprised of dense graded aggregate . . . and in or about November 2016 [Carant] spread approximately 4 inches of recycled asphalt millings over the [dense graded aggregate] also as a subbase material."[6]

Carant asserted that on February 14, 2017, an inspector from the Essex County Department of Health ("ECDOH") conducted an "unannounced" site visit in response to "an alleged anonymous complaint of improper storing of asphalt millings at the site." The ECDOH apparently

---

[4] According to West Caldwell's expert, the Project was approved by West Caldwell's Planning Board with improvements comprising 24,170 square feet. However, according to Carant's expert, "I believe that it was originally 24,170 [square feet], I think that's what was in the approvals, but when we looked at the [proposed building] plans it was actually developed at 23,935 [square feet]." The court's review of the "Layout & Dimensioning Plan," "Minor Subdivision," "Grading & Utility Plan," and "Cross Section Layout Plan" each bear the stamp "Approved" and reflect that the building's retail area is 17,649 square feet, and the building's office area is 6,521 square feet, or 24,170 square feet (17,649 + 6,521 = 24,170). The "Proposed Retail and Office Building" plans dated November 8, 2013, not approved by West Caldwell, recite a first-floor area of 17,650 square feet and second-floor area of 6,285 square feet, or 23,935 square feet.

[5] The detention basin was constructed on that portion of block 1700, lot 10 that was to be merged with the subject property.

[6] Carant's Counterstatement of Undisputed Materials Facts, Carant Limited Partnership; Anthony Pio Costa, III v. Essex County Construction Board of Appeals, Township of West Caldwell, et als., Superior Court of New Jersey, Essex County, Law Division, Docket No. ESX-L-5800-20 (the "Second Law Division Action").






issued a notice of violation to Carant, alleging that unauthorized landfill was installed on the subject property. Carant contested the notice of violation.

Carant further asserted that on or about June 8, 2017, a second complaint was registered with the ECDOH "alleging the unauthorized operation of landfill" at the subject property. On June 8, 2017, the ECDOH apparently issued Carant a second notice of violation. Carant also contested the second notice of violation.

Carant alleged that on or about July 25, 2017, West Caldwell denied Carant's building permit application for the subject property asserting that "[t]he applicant deposited undocumented asphalt millings as fill on the site which resulted in an enforcement action being filed by the [ECDOH]. This enforcement action remains pending."

In early 2018, Carant apparently retained a Licensed Site Remediation Professional ("LSRP") to conduct a subsurface investigation of the asphalt millings. The LSRP issued a report, dated March 9, 2018, finding that the presence of the millings did not cause any soil contamination or present a danger to human health or the environment. A copy of the LSRP's report was apparently furnished to West Caldwell and the NJDEP.

Carant maintained that between 2017 and 2018 representatives from the NJDEP conducted site inspections of the subject property and found no "land use violations" or violations of Carant's Flood Hazard Control Act Permit.

Carant further alleged that on or about May 21, 2018, it again applied to West Caldwell for a building permit. However, West Caldwell declined to issue a permit, instead apparently concluding that it would retain its own environmental expert to review the LSRP's findings. As a result of West Caldwell's failure to issue a building permit, Carant allegedly filed an appeal with the ECDOH.

   

Over the ensuing two years, issues apparently arose involving conflicts with ECDOH board members, the availability of a quorum of eligible ECDOH board members to hear Carant's appeal, requests to transfer venue from the ECDOH, and delays occasioned by COVID-19.[7]

In or about 2020, Carant apparently instituted the Second Law Division Action (as defined above) seeking, *inter alia*, to compel West Caldwell to issue a building permit for the subject property.

In sum, as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020, valuation dates, no building permit was issued by West Caldwell enabling Carant to commence construction of the Project.[8]

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985).

---

[7] In or about 2019, West Caldwell apparently initiated an action captioned West Caldwell Township v. Carant Limited Partnership, et als., Superior Court of New Jersey, Essex County, Law Division, Docket No. ESX-L-5584-19 (the "First Law Division Action"). The First Law Division Action raised allegations that Carant violated environmental laws, regulations, and ordinances resulting from their use of the asphalt millings on the subject property.

[8] West Caldwell's expert's report states that, "according to municipal official[s], the development approvals [granted to Carant] remain valid as of each date of valuation. However, I have been informed that pending litigation between the municipality and [Carant] has been on-going for several years. The litigation was initiated as the result of the property owner installing unapproved and uncertified millings and other materials on the site in direct violation of state laws as well as the municipal development approvals. Furthermore, it is my understanding that portions of environmentally sensitive (wetlands) were filled. Therefore, the property owner [Carant] is considered to be responsible for the delays encountered in developing the parcel due to the pending litigation. Nonetheless, the parcel remains an approved commercial development site."






"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the party challenging the local property tax assessment must have presented the court with evidence raising a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

Here, at the close of Carant's proofs, West Caldwell moved to dismiss these matters, under R. 4:37-2(b), arguing that Carant failed to overcome the presumption of validity. Affording Carant all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Carant produced cogent evidence sufficient to overcome the presumption of validity. See MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The court found that the opinions of Carant's expert, if accepted as true, raised debatable questions as to the validity of the subject property's local property tax assessments. Accordingly, the court denied West Caldwell's motions and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a court finding that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the






close of plaintiff's case-in-chief, the burden of proof remain[s] on the [party challenging the tax assessment] . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

       B.    Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Therefore, the starting point in the court's journey to discern a property's true or fair market value is the highest and best use analysis. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the valuation process."). The phrase highest and best use has been defined as:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. . . Alternatively, the probable use of land or improved property – specific with respect to the user and timing of the use – that is adequately supported and results in the highest present value.
>
> [Appraisal Institute, The Dictionary of Real Estate Appraisal, 93 (5[th] ed. 2010).]

Thus, the highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000). However, a "crucial element [to be considered] in [conducting a] highest and best use analysis is the timing for a specific use. Timing refers to when the improvements might be built as well as the future expectations of occupancy and rent levels." The Appraisal of Real Estate at






341.

Importantly, a property's highest and best use is not static; rather, it is shaped by economic and market forces. A property's highest and best use may change over time based on economic changes, a market that is in transition, from underdevelopment or overdevelopment, or from zoning changes. Thus, the highest and best use of a property "is not determined through subjective analysis by the property owner, the developer, or the appraiser; rather, the highest and best use is shaped by the competitive forces within the market where the property is located . . . the analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property." Entenmann's Inc., 18 N.J. Tax at 545 citing Appraisal Institute, The Appraisal of Real Estate 298 (11th ed. 1996)). See also Acocella v. Cedar Grove Twp., 29 N.J. Tax 325, 335-36 (2016).

In sum, the highest and best use analysis is a concept rooted in the market's perceptions of value, because the question it answers is "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). However, to appropriately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses," including considerations of the timing when an improvement may be constructed. Clemente, 27 N.J. Tax at 269.

After sequentially analyzing the highest and best use criteria, both experts concluded that the subject property's highest and best use "as vacant" was for development with a retail/office building in accordance with Carant's major site plan approval and minor subdivision approval.

However, Carant's expert opined that the timing of the subject property's highest and best use plays a pivotal role in the determination of its true or market value. Because the subject property "is subject to litigation, and right now the legal limitation that is impeding its development






moving forward with the project, is the fact that there is this litigation going on and the site can't be developed until that litigation is resolved one way or another." He further explained, "typically, when you're approved and you're in a fairly stable market, the timing for an approved property is imminent, it's not going to take years after you get your approvals to do it, it should take a fairly short period of time to pull the permits and develop, . . . in this case the site cannot be developed until the litigation is resolved, and at this point we do not know when a development would be able to occur until the litigation is resolved. . . ." Therefore, although Carant's expert concluded that the subject property's highest and best use was for development with a retail/office building in accordance with the major site plan and minor subdivision approvals, in arriving at the subject property's value, Carant's expert applied a "timing" discount.

Here, the court finds, as did the experts, that the subject property's highest and best use "as vacant," was for development with a retail/office building in accordance with Carant's major site plan and minor subdivision approvals.

C.   Valuation methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Glen Rock Bor., 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)).

The "decision as to which valuation approach should predominate depends upon the facts






of the particular case and the reaction to these facts by the experts." <u>Coca-Cola Bottling Co. of New York v. Neptune Twp.</u>, 8 N.J. Tax 169, 176 (Tax 1986) (citing <u>New Brunswick v. Tax Appeals Div.</u>, 39 N.J. 537 (1963)). <u>See also</u> <u>WCI-Westinghouse, Inc. v. Edison Twp.</u>, 7 N.J. Tax 610, 619 (Tax 1985), <u>aff'd</u>, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. <u>See</u> <u>ITT Continental Baking Co.</u>, 1 N.J. Tax at 244; <u>Pennwalt Corp. v. Holmdel Twp.</u>, 4 N.J. Tax 51 (Tax 1982).

Here, the experts considered all three valuation methods and concluded that the sales comparison approach was the proper method to derive an opinion of the subject property's true or fair market value. The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 377 (14th ed. 2013). This approach requires an appraiser to dissect and weigh market data, including trends in the marketplace, to derive a credible opinion of value. To do this, an appraiser conducts a "comparative analysis of properties," focusing on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." <u>Id.</u> at 378.

The court concludes, as did the experts, that the sales comparison approach is the most appropriate method to determine the subject property's true or fair market value.

Despite having concurred that the sales comparison approach was the most appropriate method for valuing the subject property, the experts disagreed on the unit of comparison that should be employed to discern the subject property's true or market value.

According to Carant's expert, the most appropriate unit of comparison for the subject






property is the sale price "per building square foot." For example, if a 1-acre parcel of vacant land sold for $1,000,000 with development approvals to construct a 10,000 square foot building, the unit value Carant's expert would assign to the sale would be $100.00 "per building square foot" ($1,000,000/10,000 square foot building = $100.00 per building square foot). In Carant's expert's opinion, "developers of projects like this are most concerned with cost per square foot and the developability of the site." He further expressed that, in conducting their economic and feasibility studies, developers will consider the size of the improvement to be constructed, the associated costs to construct the improvement, and the "site yield," to gauge whether a project is profitable. In his estimation, "that's what drives this [retail/office] market."

Conversely, West Caldwell's expert maintained that the most appropriate unit of comparison for the subject property is the sale price "per square foot of land area" or "per square foot of usable lot area."[9] For example, if a 1-acre parcel of vacant land (43,560 square feet) sold for $1,000,000 with approvals to construct a 10,000 square foot building, the unit value West Caldwell's expert would assign to the sale would be $22.96 "per square foot of usable lot area" ($1,000,000/43,560 square feet of vacant land = $22.96 per square foot of usable lot area). In West Caldwell's expert's opinion, following a property sale, the purchaser will often seek modification of the development approvals. Therefore, valuing a property based on the square footage of the usable land area will produce a more consistent result.

Accordingly, in determining the subject property's true or fair market value, Carant's expert applied his concluded "per building square foot" value to the proposed building plans for

---

[9] West Caldwell's expert's appraisal report identified the unit of comparison selected as "per square foot of usable land area." However, during trial he frequently referred to the unit of comparison as "per square foot of land area." The court uses the phrases interchangeably.






construction of a 23,935 square foot building.[10]  Conversely, in calculating the subject property's

true or fair market value, West Caldwell's expert applied his concluded "per square foot of land

area" value to the subject property's 1.72-acres or 75,000 square feet of land.

The unit of comparison selected by an appraiser "depend[s] on the appraisal problem and

nature of the property. . . ." Appraisal Institute, The Appraisal of Real Estate, 386 (14th ed. 2013).

Although the price "per building square foot" and price "per square foot of usable area" are both

acceptable units of comparison under the sales comparison approach, the court is mindful that the

unit of comparison selected should "indicate[s] the least amount of variance when applied to the

comparable sales." Ibid.  Stated differently, all potential units of comparison should be thoroughly

analyzed, and the "variable with the least variation would be a likely candidate for the best unit

of comparison. . . ." Ibid.

The court finds that the contrasting units of comparison selected by the experts each

possess their own unique advantages and disadvantages.  Carant's expert's unit of comparison

affords meaningful insight into how a prospective developer may value a site based on its potential

developability and yield.  West Caldwell's expert's unit of comparison similarly affords

substantial understanding about the development potential of a site, omitting the developer's

subjective considerations as to what suits the site best.  One of the potential disadvantages of

Carant's expert's unit of comparison is that it presumes, sometimes incorrectly, that in seeking

land use approvals, the developer will seek to construct the largest improvement possible as

permitted under applicable land use ordinances.  Additionally, one of the disadvantages of West

Caldwell's expert's unit of comparison is that it may be impacted and/or influenced by site

---

[10]  West Caldwell's site plan approvals were issued for a 24,170 square foot retail/office building.
Carant's proposed building plans were apparently for a 23,935 square foot retail/office building.






configuration issues, as well as environmental considerations, including wetlands, flood hazard areas, and topographical issues, rendering portions of a property undevelopable.

### 1.    Carant's expert

In Carant's expert's opinion, the subject property "is a mid-block site, that's long and narrow . . . located outside the main-stream of [the] traditional retail" areas in West Caldwell. Moreover, because the subject property is not located in a downtown business area with pedestrian foot traffic, Carant's expert found that it is "car-centric" relying principally on vehicular traffic. Thus, in conducting his sales comparison approach, Carant's expert focused on land sales for proposed neighborhood retail developments that were not corner sites, not in downtown business areas, and that were similarly "car-centric."

Carant's expert identified six comparable land sales that sold between January 2015 and August 2019. Two sales were in Passaic County, two sales were in Middlesex County, one sale was in Morris County, and one sale was in Bergen County. The unadjusted sale prices of the six sales ranged from $755,000 to $3,000,000, or $50.79 to $72.96 "per building square foot."[11] Carant's expert applied demolition cost adjustments to comparable land sale one ($200,000) and comparable land sale four ($20,000) to account for the estimated demolition costs associated with existing improvements. In addition, Carant's expert applied adjustments for perceived differences in: (i) location (ranging from -10% to 10%); (ii) access/exposure (ranging from -20% to 5%); and

---

[11] Cross-examination of Carant's expert disclosed that, "the developer of the site [comparable sale one] believed that he could get 35,000 square feet there, and that [it] would comply with the zoning." Thus, Carant's expert's reported unadjusted $51.43 "per building square foot" price for comparable sale one was premised on the developer's subjective estimate of the building size that he "believed" could be constructed, and not on any engineering plans, empirical evidence, or developmental approvals in place to construct a 35,000 square foot building. Accordingly, the court finds comparable sale one of dubious usefulness in determining the subject property's true or fair market value.






(iii) development approvals (ranging from 5% to 10%). After applying the adjustments, the adjusted sale prices of the six comparable land sale transactions ranged from $52.19 to $70.15 "per building square foot." Carant's expert relied on comparable land sales 1, 2, 3, and 4 to derive his concluded value as of the October 1, 2017, and October 1, 2018 valuation dates, and relied on all six comparable sales to derive his concluded value as of the October 1, 2019, and October 1, 2020 valuation dates. Ultimately, Carant's expert concluded that a true or fair market value of $60.00 "per building square foot" should be employed in valuing the subject property as of each valuation date.

Carant's expert applied his concluded land value "per building square foot" to the Project's building area.[12] Carant's expert then added the estimated cost of the granite curbing installed by Carant (approximately 1,500 linear feet of granite curbing) at a cost of $35.00 per linear foot, or $52,500 (1,500 lf x $35.00 = $52,500).[13] However, according to Carant's expert, the "detention basin in the southwest corner of the site, . . . looks to be in very poor condition, I'm not quite sure it was completed, or was completed to the point that it would be functional."[14] Therefore, he did not add the detention basin cost to his land value conclusion.

Accordingly, Carant's expert concluded that the subject property had an indicated value of

---

[12] Carant's expert used the unapproved proposed building plans area of 23,935 square feet, instead of the approved major site plan and subdivision approvals building area of 24,170 square feet.

[13] Based on Carant's expert's review of the Subdivision Development Costs set forth under Marshall & Swift's Cost Manual data for granite curbing.

[14] As stated above, the detention basin is not located on the subject property. Rather, based on the court's review of the minor subdivision map, the detention basin is located on the approximately 80,114 square feet of land comprising block 1700, lot 10, which was to be subdivided and merged with the subject property. However, during trial, no evidence was introduced that the subdivision and merger was accomplished.






approximately $1,490,000, as of each valuation date involved herein.[15]

Finally, after reviewing PwC survey data of national discount rates for varying property types, Carant's expert applied a 10% discount rate to the subject property's indicated value. In Carant's expert's opinion, because "construction at the subject property has been halted and [is] subject to ongoing litigation," the reasonable expectation of when construction can commence and tenant occupancy occur, remains uncertain. Therefore, Carant's expert opined that a 10% discount rate should be applied to his indicated value. In sum, Carant's expert concluded that the subject property had a true or fair market value of $1,340,000, as of each valuation date involved herein.

2.    West Caldwell's expert

In valuing the subject property, West Caldwell's expert testified that he examined land sales bearing a highest and best use comparable to the subject property, or a use that is permitted in West Caldwell's B-3 General Business zoning district. Moreover, according to West Caldwell's expert, valuing the subject property on a "per square foot of land area" or "per square foot of usable lot area" was most appropriate because, in his opinion, "most times when properties are sold with approvals those approvals change, they are either revised upward or downward for building size, in some cases . . . the use of the property that it was approved for never gets built . . . so your analysis would be skewed at that point." Thus, West Caldwell's expert opined that a property's per square foot of land area or usable lot area offered a more consistent estimate of value.

West Caldwell's expert identified four comparable land sales that sold between January 2017 and February 2018. All four sales were in Essex County. The unadjusted sale prices of the

---

[15] Carant's expert's indicated value was $1,488,600 based on the proposed building plans area of 23,935 square feet (23,935 x $60.00 = $1,436,100 + $52,500 = $1,488,600). Employing the major site plan approvals building area of 24,170 square feet, the indicated value would have been $1,502,700 (24,170 sq. ft. x $60.00 = $1,450,200 + $52,500 = $1,502,700).






four land sales ranged from $1,150,000 to $3,250,000, or $28.56 to $75.25 "per square foot of usable lot area." West Caldwell's expert applied demolition cost adjustments to comparable land sale two ($50,000), comparable land sale three ($250,000), and comparable land sale four ($50,000), to account for the estimated demolition costs associated with the existing improvements. In addition, West Caldwell's expert applied adjustments for perceived differences in: (i) corner lot location (-20%); (ii) overall property location (10%); (iii) lot size (-15%); and (iv) development approvals (10%). After applying the adjustments, the adjusted sale prices of the four comparable land sale transactions ranged from $27.13 to $56.44 "per square foot of usable lot area." West Caldwell's expert relied on all four comparable land sales to reach his conclusion of the subject property's true or fair market value as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates.[16] Ultimately, West Caldwell's expert concluded that a true or fair market value of $35.00 "per square foot of usable lot area" should be employed as of each valuation date involved herein.

West Caldwell's expert applied his concluded $35.00 "per square foot of usable lot area" value to the subject property's 75,000 square feet. According to West Caldwell's expert, although he was verbally advised that portions of the subject property may be impacted by wetlands, he was never presented with any documentation evidencing the size of the area impacted by wetlands.[17] According to West Caldwell's expert, he valued the subject property "unencumbered [and] without

---

[16] West Caldwell's expert testified that he placed the most emphasis on comparable sale one, comparable sale two, and comparable sale three.

[17] The court's review of the "Existing Conditions Map," "Layout & Dimensioning Plan," "Minor Subdivision Plan," and "Grading & Utility Plan," annexed to Carant's expert's appraisal report discloses that an area along the subject property's northerly lot line comprising approximately fifty to seventy-five square feet, are designated as wetlands. However, the court's review of those maps and plans further discloses that areas of the rear adjacent property (block 1700, lot 10) that was proposed to be subdivided and merged with the subject property, comprise wetlands.






any adverse environmental conditions." Thus, he made no deduction for that portion of the subject property impacted by wetlands, if any.

Accordingly, West Caldwell's expert concluded that the subject property had a true or fair market value of $2,625,000 (75,000 x 35.00 = $2,625,000), as of each valuation date involved herein.

### 3. Court's analysis

Due to the differing units of comparison employed by the experts in evaluating the comparable land sales and valuing the subject property, it was not possible for the court to precisely reconcile their respective valuation approaches. Thus, the court's analysis of the evidence and testimony focused on the similarities and differences identified by the experts between the subject property and the comparable land sales. In examining the comparable land sales, the court scrutinized the comparable land sales to discern which possessed the least variations from the subject property. In addition, the court weighed and considered the adjustments applied by the experts to account for perceived differences, including the sufficiency of the evidence, data, and market support for the adjustments, to gauge the reasonableness and reliability of the experts' value conclusions.

It is well-settled that "[a]djustments must have a foundation obtained from market-derived sources or objective data and not be based on subjective observations and/or personal experience." VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 571 (Tax 2017). An appraiser's adjustments "must have a foundation obtained from the market. . . ." Greenblatt, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Id. at 55






a.     Carant's expert

Here, cross-examination revealed that Carant's expert's comparable land sale one, two, and five were sold without development approvals. Moreover, during cross-examination, Carant's expert acknowledged that a property sold with development approvals generally secures a higher purchase price than a property sold without development approvals. Thus, to account for the lack of development approvals for comparable land sales one, two, and five, Carant's expert applied a 10% upwards development approvals adjustment.

However, Carant's expert's report offered no market data or analysis enabling the court to gauge the accuracy and reliability of such adjustment. During cross-examination, Carant's expert acknowledged that his appraisal report contains no data or analysis supporting his 10% developmental approvals adjustment stating, "I don't believe there's anything specific [data or analysis] in the report." In response to further cross-examination questioning how his appraisal report arrived at the development approvals adjustment, Carant's expert could only identify the statement, "[s]ales [1], 2 and 5 were sold without approvals and a larger upward adjustment was applied to account for the additional risk of obtaining entitlements." In sum, Carant's expert's report offers no meaningful market data or analysis demonstrating that the development approvals adjustment accurately accounted for the difference in sales price of a property sold with development approvals and a property sold without development approvals.

Moreover, the only testimony elicited from Carant's expert during trial in support of his development approvals adjustment was, "we took a look at the [comparable land] sales and what happened during the course of those sales, the complexity of getting the approvals, the cost of which those adjustments tend to relate to the adjustment, and we made our adjustments based on






that analysis."[18] However, Carant's expert offered no meaningful testimony regarding what events occurred during those sales impacting the development approvals, the length of time that it took to obtain the approvals with the comparable land sales, the actual costs incurred in obtaining the development approvals, the complex issues faced in obtaining the development approvals, etc., and how those considerations translated into a 10% development approvals adjustment.

Effective cross examination further disclosed that Carant's expert's comparable land sale one was resold less than three years following its sale, on December 6, 2017, with developmental approvals in place to construct a 35,962 square foot grocery store, for reported consideration of $4,650,000, or approximately $129.30 "per building square foot."[19] Thus, despite Carant's expert's opinion that a 10% upwards development adjustment, and final adjusted price of $56.57 "per building square foot," accurately accounted for the value attributable to development approvals, the property actually resold with development approvals in place for approximately $129.30 "per building square foot."[20]

---

[18] During cross-examination, in support of his 5% upwards adjustment to comparable land sales three, four, and six, to account for the estimated costs associated with the purchaser obtaining development approvals, Carant's expert credibly testified that, "buying subject to [approvals] essentially eliminates the risk, that might not be apparent in a property purchased without subject to, which is the reason why most properties in New Jersey are purchased that way, it eliminates the risk, the only risk that the developer really is subject to, is whatever they spend on their development applications, and so the 5% adjustment is based on . . . taking a look what some of the costs associated might be with obtaining some of the approvals. . . ."

[19] Carant's expert's comparable land sale one consisted of 3.34 acres and resold on December 6, 2017, to LIDL US Operations, LLC for reported consideration of $4,650,000, or $129.30 "per building square foot." The adjacent lot, consisting of approximately 0.47 acres (per the Hanover Township Planning Board Resolution), sold on December 6, 2017, to LIDL US Operations, LLC for reported consideration of $775,000. Thus, the two lots sold on December 6, 2017, for a total reported consideration of $5,425,000, or $150.85, "per building square foot."

[20] Carant's expert acknowledged that his comparable land sale one subsequently sold on December 6, 2017, during the valuation periods involved herein, with development approvals in place. However, according to Carant's expert, because the subsequent sale was not "exposed to the market," he did not rely on that sale in determining the subject property's true or market value.






Carant's expert also offered no empirical data or analysis demonstrating that his 10% development approvals adjustment to comparable land sale two appropriately accounted for the difference in price between a property sold with and without development approvals in place.

Moreover, cross-examination further revealed that, based on Carant's expert's office's discussions with comparable land sale two's purchaser, "a 27,000 square foot auto dealership is planned for the site." However, Carant's expert's report states that the municipal zoning "permits a buildable square footage of 34,813 square feet on the site." Because development involved construction of a car dealership, Carant's expert opined that the improvements being constructed were not to the property's full potential. Accordingly, in computing his "per building square foot" value for comparable land sale two, Carant's expert employed the 34,813 buildable square feet to discern his estimated $72.96 "per building square foot" price.[21] However, comparable land sale two was the only sale that Carant's expert used the municipal ordinance's "buildable square footage."

Interestingly however, Carant's expert used the subject property's unapproved and proposed building plans, reciting a 23,935 square foot building area, rather than employing West Caldwell's major site plan approvals permitting a 24,170 square foot building. Moreover, effective cross-examination revealed that in calculating the subject property's value, Carant's expert did not use West Caldwell's ordinance, permitting a 37,500 square foot building to be constructed on the subject property (75,000 lot area x .25 building coverage x 2 story height = 37,500). According to Carant's expert, he did not use West Caldwell's ordinance because he believed the subject

---

[21] Cross-examination disclosed that Carant's expert's comparable sale two was resold on September 22, 2021, with developmental approvals in place (after obtaining bulk and use variances), to construct a 99,000 square foot self-storage facility, for consideration of $3,500,000.






property was negatively impacted by wetlands. However, as detailed above, the court's review of the major site plan and minor subdivision approvals disclosed that only a *de minimus* portion of the subject property was impacted by wetlands.[22] In sum, the court questions Carant's expert's selective use and application of the permitted building area in identifying and relying on comparable land sale two as evidence of market value.

Finally, Carant's expert again offered no empirical data or analysis demonstrating that his 10% development approvals adjustment to comparable land sale five appropriately accounted for the difference in price between a property sold with and without development approvals.

Moreover, cross-examination disclosed that Carant's expert's comparable land sale five was previously granted qualified farmland status. According to Carant's expert, the purchaser assumed responsibility for and paid the rollback taxes attributable to its purchase of the property. However, Carant's expert elected to make no adjustment to comparable land sale five's purchase price to account for the additional cost associated with three years of rollback taxes. In addition, Carant's expert did not furnish the court with any information regarding the rollback taxes actually paid, to enable the court to independently apply said additional consideration to the purchase price.

In sum, the court finds that Carant's expert failed to furnish the court with any market derived data, support, analysis, or empirical evidence demonstrating the accuracy and reliability of his development approvals adjustments to comparable land sales one, two, and five. Accordingly, for all the reasons set forth above, the court finds that Carant's expert's reliance on

---

[22] The court's review of the "Layout & Dimensioning Plan," "Minor Subdivision," "Grading & Utility Plan," and "Cross Section Layout Plan" each bearing the stamp "Approved" revealed that an area of approximately fifty to seventy-five feet of the subject property was impacted by wetlands. However, the approximately 80,114 square feet of land comprising block 1700, lot 10, which was to be subdivided and merged with the subject property was impacted by wetlands. However, no evidence was introduced at trial that the subdivision and merger was accomplished.






comparable land sales one, two, and five is misplaced and that those sales are not credible evidence of the subject property's true or market value as of any valuation date involved herein.

Moreover, Carant's expert offered testimony that his "access/exposure" adjustments were based on his review of a New Jersey Department of Transportation traffic count study and a comparison of the median household income of the municipalities where the subject property and the comparable land sales were located. After reviewing the traffic studies and median household income figures, Carant's expert applied a downward 10% access/exposure adjustment to comparable land sale three. However, cross-examination disclosed that comparable land sale three's traffic count was 62,111 vehicles, approximately 214% greater than the subject property's traffic count of 19,777. Moreover, the median household incomes of the municipalities where comparable land sale three is located and where the subject property is located were very similar; $127,979 versus $120,546. However, Carant's expert failed to adequately explain how the 214% difference in the traffic count study translated into a downward 10% access/exposure adjustment to comparable land sale three.

In addition, effective cross-examination further disclosed that Carant's expert's comparable land sale three obtained development approvals in September 2020, approximately three years following its sale, for the construction of a 48,240 square foot extended stay lodging facility.[23] Thus, the court questions whether comparable land sale three possessed a highest and best use akin to the subject property. As stated above, the highest and best use of a property is

---

[23] Cross-examination disclosed that in 2021, following receipt of the hotel development approvals, comparable sale three resold for $1,875,000, or approximately $1,040,000 more than it sold in 2016. However, Carant's expert did not consider the 2021 resale of comparable land sale three because it was "subsequent to our valuation date . . . and it's for a different use, so it wouldn't be relevant, since it's not the same highest and best use."






dictated by an analysis of the marketplace and the marketplace's perceived reaction to a property. Here, the purchaser of comparable land sale three seemingly thought that the highest and best use of the property was not for a retail use, but rather as an extended stay hotel, and sought development approvals to use the property for that purpose.

In sum, the court finds Carant's expert's comparable land sale three possessed a highest and best use determined by the market to be different from the subject property's highest and best use. See Ford Motor Co., 127 N.J. at 302 (stating that the highest and best use analysis involves examination of the question "[w]hat use would the market make of that property?"). Moreover, Carant's expert failed to furnish the court with any analysis or support demonstrating the accuracy and reliability of his 10% access/exposure adjustment to comparable land sale three. Accordingly, for all the reasons set forth above, the court finds Carant's expert's reliance on comparable land sale three is also misplaced and it is not credible evidence of the subject property's true or market value as of any valuation date involved herein.

However, the court finds that Carant's expert's comparable land sale four and six are both located in a similar "car-centric" community, have median household income like West Caldwell, are in zoning districts akin to the subject property, and have traffic counts similar to the subject property. Therefore, the court concludes that comparable sale land four ($70.15 per square foot) and comparable land sale six ($69.46 per square foot) are credible evidence of the subject property's true market value. Accordingly, employing Carant's expert's "per building square foot" unit of comparison, the court concludes that a $70.00 "per building square foot" value is reasonable and supported by the evidence for all tax years at issue.

     b.    West Caldwell's expert

West Caldwell's expert testified that he developed his corner lot location adjustments and






lot size adjustments by analyzing his comparable land sales and several other land sales identified in the addenda of his appraisal report. In developing his downward 20% corner lot location adjustment, West Caldwell's expert stated that he,

> looked at this sale [on page a20 of his appraisal report], as well as the sale on page a26 [of his appraisal report], which is another interior location and I also looked at . . . [comparable] sale 2 . . . in the grid on page 35 which is a non-corner location. I compared those to sales one and three in the [appraisal] report to develop my 20% adjustment for a corner location.

More specifically, West Caldwell's expert testified that he,

> analyzed [comparable land] sale 2, sale a20, and the sale on a26, and I compared those with sale one and sale three in the appraisal [report] on page 35 . . . I compared those two with the adjustments just to isolate what the corner location adjustment would warrant, and after my adjustments to those sales, I developed a difference of approximately $9.00 a square foot being the difference for the corner location, and that reflects approximately 18½%, and I rounded [it] to [a] 20% downward adjustment.

Similarly, in developing his lot size adjustment, West Caldwell's expert testified that he examined the sale prices of comparable land sales one, two, and four, each having a lot size significantly smaller than the subject property's lot size. Next, he examined the sale price of comparable land sale three, having a lot size nearly identical to the subject property. West Caldwell's expert further testified that,

> the average of the three [comparable land] sales 1, 2, and 4 was found at around $55.14 a square foot, compared that with the sale price of lot size sale 3 of $46.59, the difference was approximately $8.55, that reflects 15.5% based on the $55.14 average, which I rounded to 15%, that's how I developed my [lot size] square foot adjustment.

The court finds West Caldwell's expert's analysis, market derived evidence, and testimony in support of his corner lot location and lot size adjustments to be credible and reliable. West






Caldwell's expert's corner lot and lot size adjustments were supported by his detailed analysis of land sales in the marketplace, and not made from subjective observations or personal experience.

However, the court finds that West Caldwell's expert's inferior location adjustment (applied to comparable land sale two) and development approvals adjustment (applied to comparable land sale four) lack an analysis based on market data. With respect to comparable land sale two, West Caldwell's expert's appraisal report states only that "this is an interior parcel which is situated immediately west of the City of Newark border and in this regard is considered inferior to the subject in terms of location." Moreover, during trial West Caldwell's expert testified that,

> I felt [comparable sale two] was inferior to the subject property, as far as general location, it's in the eastern portion of the Township of Bloomfield, . . . along the border of the City Newark and City of East Orange, I felt it was inferior in that regard, . . . I made an upwards adjustment of 10% for [inferior] location.

However, other than opining that he "felt" an upwards adjustment was warranted, West Caldwell's expert offered no meaningful testimony or evidence identifying any market data or analysis supporting his inferior location adjustment to comparable land sale two.[24] [25]

In addition, with respect to the upwards 10% development approvals adjustment applied to comparable land sale four, West Caldwell's expert's appraisal report states only, "the subject property has development approval[s] for a commercial building . . . Sale four was conveyed

---

[24] During trial West Caldwell's expert acknowledged that comparable land sale two is a corner location. However, West Caldwell's expert did not apply a downward 20% corner lot adjustment to comparable land sale two in his appraisal report, nor did he offer any testimony during trial as to why he did not apply a corner lot adjustment to comparable land sale two.

[25] Moreover, effective cross-examination revealed that comparable land sale two is in a more urban mass-transit oriented neighborhood, approximately ½ mile from a New Jersey Transit commuter rail station, and adjacent to a redevelopment area experiencing the construction of several new large-scale residential buildings.

   

without development approvals and therefore I have applied an upward adjustment." However, West Caldwell's expert offered no meaningful testimony or evidence identifying the market data that he analyzed in deriving his development approvals adjustment for comparable land sale four.

Accordingly, for the above-stated reasons, the court finds that West Caldwell's inferior location adjustment (to comparable land sale two) and development approvals adjustment (to comparable land sale four) are not credible and reliable. Therefore, without adequate evidence in the trial record to discern the appropriate adjustment amounts, if any, to account for the perceived inferior location and lack of development approvals, the court must exclude from consideration West Caldwell's expert's comparable land sale two and four.

In addition, cross-examination further disclosed that the land use ordinances in the taxing districts where comparable land sale two and three are located permit building lot coverages disparate from West Caldwell's building lot coverage. Cross-examination disclosed that comparable land sale two permits 100% building lot coverage. Similarly, cross-examination revealed that comparable land sale three permits 60% building lot coverage. In sharp contrast, West Caldwell's land use ordinance permits only 25% building lot coverage for the subject property.[26]

As credibly offered by Carant's expert, developers of retail/office centers like the subject property are predominantly concerned with issue like the "developability of the site" and "site yield." Because building lot coverage is an issue that impacts the "developability of the site" and "site yield," appraisers should be mindful of its potential impact on the market value of land. For

---

[26] Building lot coverage, also known as building coverage ratio, is a land use term referring to that percentage of a lot that may be covered by a building. Stated differently, it is the portion of a lot, when viewed from above, that may be covered by a building or buildings.






instance, land sold in a municipality having a land use ordinance permitting greater building lot coverage may be viewed as more advantageous and profitable because it will afford the developer the ability to construct a larger improvement. Conversely, vacant land sold in a municipality with a land use ordinance that is more restrictive and limits a developer's ability to develop the site may be viewed as less profitable, and thus, less valuable.

Here, the evidence disclosed that comparable land sale two allows 100% building lot coverage and comparable land sale three allows 60% building lot coverage, while the subject property is limited to 25% building lot coverage. However, in selecting his comparable land sales, West Caldwell's expert failed to give any consideration to how the building lot coverages impacted these sales. Accordingly, for all the above-stated reasons, the court finds that West Caldwell's comparable land sale two, three, and four are not reliable and credible evidence of the subject property's true or fair market value.

However, the court finds that West Caldwell's expert's comparable land sale one is in the same municipality as the subject property, located on the same road, is timely, and in the same B-3 zoning district as the subject property. Moreover, the court finds that West Caldwell's expert's adjustments to comparable land sale one for corner lot location and lot size were reasonable and were based on his detailed analysis of market data. Accordingly, employing West Caldwell's expert's "per square foot of usable lot area" unit of comparison, the court finds that a $35.00 "per square foot of usable lot area" value is reasonable.

    c.    <u>Reconciliation</u>

Reconciling the court's findings that: (i) a $70.00 "per building square foot" value is reasonable under Carant's expert's valuation method; and (ii) a $35.00 "per square foot of usable lot area" value is reasonable under West Caldwell's valuation method, discloses a value range of






$1,744,400 to $2,677,500.[27]  According both valuation methods equal weight, the court concludes that the subject property had an indicated value of $2,200,000, as of all valuation dates involved herein.

However, the court further finds credible Carant's expert's testimony that a discount rate must be applied to the subject property's indicated value to account for the "timing" considerations involving the subject property's litigation and uncertainty regarding when it may be able to achieve its highest and best use.  The court's review of the PwC "National Development Land Market" data reveals that discount rates ranged from 10% to 25% during the tax years at issue with an average rate between 15.40% to 15.90%.  The court concludes that Carant's expert's 10% discount rate is reasonable, considering the subject property's ongoing litigation.  Accordingly, the court will apply a 10% discount rate to the subject property's indicated value.

Therefore, the court finds that the true or fair market value of the subject property was $1,980,000, as of the October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020 valuation dates ($2,200,000 - $220,000 = $1,980,000).

        D.    <u>Corrected local property tax assessment</u>

Having reached conclusions of the subject property's true or fair market value, the court will turn its attention to determining the correct assessment for the 2018, 2019, 2020, and 2021 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower

---

[27]  Computed as follows: (i) 24,170 sq. ft. building x $70.00 = $1,691,900 + $52,500 (curbing) = $1,744,400; (ii) 75,000 sq. ft. lot x $35.00 = $2,625,000 + $52,500 (curbing) = $2,677,500.

  

limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ."  N.J.S.A. 54:51A-6(a).  This process involves application of the Chapter 123 common level range.  N.J.S.A. 54:1-35a(b).  When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| true market value | x | average ratio | = | revised taxable value |
|---|---|---|---|---|

For the 2018 tax year, the ratio of assessed value, $1,875,000, to true market value, $1,980,000, yields a ratio of 0.947% ($1,875,000/$1,980,000 = 0.9469%), which falls between the lower limit (76.91%) and upper limit (104.05%) of West Caldwell's Chapter 123 common level range.  Consequently, no reduction in the subject property's tax assessment is warranted for the 2018 tax year.

For the 2019 tax year, the ratio of assessed value, $1,875,000, to true market value, $1,980,000, similarly yields a ratio of 0.947% ($1,875,000/$1,980,000 = 0.9469%), which falls between the lower limit (76.15%) and upper limit (103.03%) of West Caldwell's Chapter 123 common level range.  Consequently, no reduction in the subject property's tax assessment is warranted for the 2019 tax year.

For the 2020 tax year, the ratio of assessed value, $1,875,000, to true market value, $1,980,000, similarly yields a ratio of 0.947% ($1,875,000/$1,980,000 = 0.9469%), which falls between the lower limit (76.15%) and upper limit (103.03%) of West Caldwell's Chapter 123 common level range.  Consequently, no reduction in the subject property's tax assessment is warranted for the 2020 tax year.

For the 2021 tax year, the ratio of assessed value, $1,875,000, to true market value, $1,980,000, similarly yields a ratio of 0.947% ($1,875,000/$1,980,000 = 0.9469%), which falls


Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


between the lower limit (77.35%) and upper limit (104.65%) of West Caldwell's Chapter 123

common level range. Consequently, no reduction in the subject property's tax assessment is

warranted for the 2021 tax year.

Contemporaneously with the issuance of this letter opinion, the court is entering the above-

referenced judgments.

## III. Conclusion

For the foregoing reasons, the court affirms the subject property's 2018, 2019, 2020, and

2021 tax year assessments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




