## TAX COURT OF NEW JERSEY



JOSHUA D. NOVIN
Judge

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

October 9, 2024

Chad E. Wolf, Esq.
Wolf Vespasiano, LLC
331 Main Street
Chatham, New Jersey 07083

Lee Turner, Esq.
Florio Kenny Raval, L.L.P.
125 Chubb Avenue
Suite 310 N
Lyndhurst, New Jersey 07071

> Re:  Omari, Omar v. Paterson City
>      Docket Nos. 010801-2021, 008234-2022, and 009927-2023

Dear Mr. Wolf and Mr. Turner:

This letter constitutes the court's opinion following trial of plaintiff, Omar Omari's ("plaintiff") challenge to the 2021, 2022, and 2023 local property tax assessments on plaintiff's improved property in the City of Paterson ("Paterson").

For the reasons stated below, the court finds that plaintiff is not entitled to relief from the 2021 and 2022 tax year assessments. Therefore, contemporaneously herewith the court will enter judgments dismissing plaintiff's 2021 and 2022 tax year complaints with prejudice. However, the court finds that relief is warranted from the 2023 tax year assessment. The court will afford plaintiff and Paterson thirty (30) days to submit briefs and proposed calculations addressing Paterson's 2023 effective tax rate.

### I.   Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law






based on the evidence and testimony offered during trial.

Plaintiff is the owner of the real property and improvements located at 270 Broadway Avenue, Paterson, New Jersey. The property is located on the corner of Broadway Avenue and Summer Street, in Paterson's 4th Ward Redevelopment Zone. The property is identified on Paterson's municipal tax map as block 4305, lot 1 (the "subject property").

Plaintiff timely filed complaints challenging the subject property's 2021, 2022, and 2023 tax year assessments. During trial plaintiff offered testimony from a New Jersey certified general real estate appraiser, who was accepted by the court as an expert in the real property valuation field ("plaintiff's expert").[1] Plaintiff's expert prepared an appraisal report containing photographs of the subject property and expressing opinions regarding the subject property's true or fair market value as of each valuation date. Paterson did not offer any fact or expert witness testimony.

As of each valuation date the subject property's local property tax assessments, implied equalized value, and plaintiff's expert's value conclusions are set forth below:

| Valuation date | Tax assessment | Average ratio of assessed to true value | Implied equalized Value | Plaintiff's expert's valuation |
|---|---|---|---|---|
| 10/1/2020 | $773,500 | 76.25% | $1,014,426 | $810,000 |
| 10/1/2021 | $773,500 | 67.98% | $1,137.835 | $835,000 |
| 10/1/2022 | $773,500 | 59.35% | $1,303,286 | $835,000 |

The subject property consists of an 0.0878-acre lot and is improved with a brick 9,513 square foot three-story mixed used building erected in or about 1970. The building consists of two ground floor retail units (located along Broadway Avenue), and ten (10) apartments units. The retail units comprise approximately 1,900 square feet and were operated as a bodega/grocery store

---

[1] Paterson's counsel stipulated to the qualifications of plaintiff's appraiser as an expert in the real property valuation field.






and as a fast-food restaurant as of the valuation dates. The entrance to the building's apartment units is located along Summer Street. The subject property offers no on-site parking.

The subject property is self-managed by the plaintiff and in fair to average condition. The property does not have an elevator, no laundry facilities, and there is no residential superintendent. During trial, plaintiff's expert characterized the subject property's neighborhood as a "rougher [urban] area of Paterson," that is "filled with more high-density properties." According to plaintiff's expert, "this is not Main Street, where people will go to . . . shop, the people coming to this [property's retail units], are the people that live within a few blocks" away from the subject property.

The subject property consists of six (6) one-bedroom apartments, and four (4) two-bedroom apartments. Plaintiff is responsible for furnishing heat, hot and cold water, and electricity to the building's common areas. However, each apartment is separately metered for electricity, and the tenants are responsible for their own electric charges.

Plaintiff's expert's appraisal report contained interior photographs of two of the apartments. The photographs reveal that one apartment has been more recently partially refurbished with composite flooring installed in the kitchen and bedroom, and melamine or particle board cabinets and Formica countertops installed in the kitchen. However, the photographs of the other apartment reveal that it has not been refurbished in several years with acoustic drop ceiling tiles in the living room, living room floors tiles that are partially comprised of wood parquet and partially comprised of composite tiles, and a hotchpotch of different cabinetry and countertops in the kitchen. Each apartment kitchen is equipped with a refrigerator, stove/oven, and sink. In addition, each apartment contains a three-fixture bathroom.

As of the valuation dates, Paterson had enacted a rent control ordinance that was applicable

   

to the subject property. According to plaintiff's expert, the rent control ordinance limited the rent increase that a property owner may charge for an apartment to five percent (5%) per year, or three and one-half percent (3½%) if the tenant was sixty-five years of age or older.

According to plaintiff's expert, the permitted uses in Paterson's 4th Ward Redevelopment Zone included various residential and commercial uses. Thus, operation of the subject property as a mixed-use multi-family apartment and retail building is a legally conforming use.[2]

## II. Conclusions of Law

### A. Presumption of validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic Cty., 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

---

[2] Plaintiff's expert's appraisal report did not contain a copy of Paterson's zoning ordinance or Paterson's 4th Ward's Redevelopment Plan. Rather, the report merely recites that the permitted uses are "various residential and commercial uses."






In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

At the close of plaintiff's proofs, Paterson moved to dismiss these matters under R. 4:37-2(b), arguing that the presumption of validity that attaches to the subject property's tax assessments had not been overcome.[3] The court denied the motion and placed a statement of reasons on the record. Without recapitulating in detail the ruling, the court found that although plaintiff's expert's testimony and appraisal report were not flawless, affording plaintiff all reasonable inferences that

---

[3] Paterson argued that plaintiff's expert's analysis was flawed for several reasons, including that: (i) plaintiff's expert accepted the subject property's reported apartment rents as market rents, without having performed a detailed market analysis of apartment rents in the Paterson marketplace; (ii) the comparable operating expenses relied on by plaintiff's expert to compute the subject property's stabilized expenses were for properties not located in Passaic County, and were for tax years that were between two to four years prior to the valuation dates involved herein, and represented an average of between two to five years of operating expenses; and (iii) plaintiff's expert could not explain the defining features of the CoStar report rating system, and why it identified the subject property as a two star building, and could not provide the address of any of the other buildings in Passaic County that CoStar relied upon to generate its vacancy reports.






could be deduced from the evidence presented, plaintiff produced sufficient cogent evidence to overcome the presumption of validity. The opinions of plaintiff's expert, if accepted by the court as true and credible, raised debatable questions as to the validity of the subject property's tax assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B.    Highest and best use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis is a concept rooted in the market's perceptions of value because it answers the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). To accurately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis






is "the first and most important step in the valuation process").

Here, plaintiff's expert concluded that the subject property's highest and best use, as vacant, was for multi-family residential development, and as improved, was for its present use as a mixed-use retail and multi-family building. In explaining how he arrived at that conclusion, plaintiff's expert testified that Paterson's zoning "allows various residential and commercial uses, and on top of that lot size wise, . . . this isn't a big lot that you would consider tearing down [the existing improvements] and building a much bigger building. . . ." According to plaintiff's expert, "we look at alternate uses to the site, and having found that tearing down this building, and building something else just wouldn't be appropriate here, it's a functioning commercial property with no other alternate uses that I found to be a highest and best use." Moreover, plaintiff's expert testified that he reviewed vacant land sales zoned for multi-family dwellings in the Passaic County marketplace and reviewed Paterson's zoning laws. Based on that review, he determined that a maximum of approximately ten apartments could be constructed on the subject property. In his opinion, if the site was vacant, a developer would not construct a building having a retail component, because it would not add value to the property. Thus, he reasoned that as vacant, the subject property's highest and best use was for multi-family residential development.

The court finds plaintiff's expert's opinion credible and concludes that the subject property's highest and best use, as vacant, is for a development with a multi-family residential building in accordance with applicable zoning ordinances and redevelopment plans, and as improved, is for its present use as a mixed-used retail and multi-family apartment building.

C.    Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird &






Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking

Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal

methods utilized to predict what a willing buyer would pay a willing seller on a given date,

applicable to different types of properties: the comparable sales method, capitalization of income

and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing

Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 1996), certif. denied, 168 N.J. 291

(2001)). The "decision as to which valuation approach should predominate depends upon the facts

of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of

New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax

Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax,

610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted

in support of one approach overshadow those submitted in support of any other approach, the court

may conclude which approach should prevail. ITT Continental Baking Co., 1 N.J. Tax 244;

Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51 (Tax 1982).

    1.    Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the favored

method for determining the estimated value of that property. Parkway Vill. Apartments Co. v.

Cranford Twp., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other

grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction

Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996).

The income capitalization approach is

> based on the principle of anticipation, which states that value is
> created by the expectation of benefits to be derived in the future. In
> other words, the value of an apartment property reflects what a






prudent purchaser-investor would pay for the present worth of an anticipated annual income stream and the reversionary benefit to be realized at the end of the anticipated holding period.

[Appraisal Institute, The Valuation of Apartment Properties, 97 (2nd ed. 2008).]

Thus, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value. As Judge Hopkins succinctly stated, in valuing a property using the income capitalization approach:

the gross rental value of the property is estimated. From the estimated gross rental there is deducted a factor for possible vacancies and collection losses. This results in effective gross income. Then all the expenses involved in running the property are subtracted, resulting in net income. Net income is the money which an investor could expect to receive through an investment in the property. It is computed into a value by means of a capitalization rate which embodies consideration of capital cost, remaining economic life of the property, and the degree of risk involved.

[Lamm Associates v. West Caldwell Borough, 1 N.J. Tax 373, 377 (Tax 1980).]

Here, the court concludes, as did plaintiff's expert, that the income capitalization approach is the most appropriate method to derive the estimated true or market value for the subject property.

a.     Market or Economic Rent

The first and often most critical "step in applying the income approach is to accurately forecast the future income and expenses associated with ownership of the property." The Valuation of Apartment Properties, at 97. Forecasting a property's gross rental income requires an expert to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments, 108 N.J. at 270.

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease






agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). Notably, the market rent ascribed to a property may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Vill. Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

> 1. Apartment units

Absent contrary convincing evidence, the actual rents paid in a well-managed apartment complex are clear evidence of economic rent. G & S Co. v. Borough of Eatontown, 2 N.J. Tax 94, 98 (Tax 1980), aff'd, 6 N.J. Tax 218 (App. Div. 1982). In Parkview Vill. Assocs. our Supreme Court explained that:

> [i]n the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project . . . functioning as customary with leases of relatively short length, should be deemed *prima facie* to represent its fair rental value for purposes of the capitalized income method of property valuation. A court . . . should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent.
>
> [Parkview Vill. Assocs., 62 N.J. at 34.]

Hence, when an apartment complex is being commercially operated and is well-managed, the court shall accord the taxpayer a presumption that the actual rent collected, as of the assessing date, is equivalent to the economic rent. Glen Wall Assocs. v. Twp. of Wall, 99 N.J. 265, 276 (1985). When the "gross rental value of the property on the respective assessing dates . . . [is] based on the actual rent rolls and . . . no convincing testimony [was presented] that the management was not charging market rent," that is the most trustworthy evidence of income. Jefferson House






Investment Co. v. Chatham, 4 N.J. Tax 669, 676-77 (1982). "An analysis of rents must begin with the *present* rent schedule for the subject property." Brunetti v. City of Clifton, 7 N.J. Tax 161, 172 (Tax 1984) (emphasis in original). Accordingly, when available, the "actual rent roll" of a property as of the "critical assessing date" is fundamental to determining the true value of a property. Glen Wall Assocs., 99 N.J. at 274.

However, a taxing district has the ability to overcome this presumption by presenting "'convincing evidence' that (1) the leases are not economic because the property is not well managed, (2) the leases are not economic because they are old, long term leases, or (3) the leases are not economic as shown by a comparison with at least four comparable apartment properties." Parkway Vill. Apartments Co., 108 N.J. at 272; see also Glen Wall Assocs., 99 N.J. at 276; Equitable Life Assur. Soc. of US v. Secaucus Town, 16 N.J. Tax 463, 466-67 (App. Div. 1996); G & S Co. v. Eatontown, 2 N.J. Tax at 94. Thus, when an apartment building is being commercially operated with customary one-year residential leases and is well-managed, to overcome the presumption, the taxing district must present the court with convincing evidence that the property is not well managed, that the leases do not represent economic rent because they are old, long-term leases, or that the leases are not at market rate with evidence of no less than four comparable apartments.

Here, plaintiff's expert testified that in determining the subject property's economic rent, and consequently, the potential gross income arising from "the apartment[s] . . . we used the actual" rents. According to plaintiff's expert, "we look at the market, just to make sure they're [the apartment rents] in line, but typically these are one-year leases and landlords want the most rent. This is a rent-controlled area." Plaintiff's expert further offered that "I did a market analysis . . . I reviewed comparable [apartments] in the area, and they fell in line with the subject . . .






[however, that analysis] is not in my report."[4]  Although plaintiff's expert expressed during trial that the plaintiff "isn't a sophisticated property owner, like with a big management company," based on his review of the rent rolls and the marketplace, he concluded that the subject property's actual rents were at market rate.

According to plaintiff's expert, the subject property's rent rolls reported rents of: (i) $800 per month, for the one-bedroom apartments, and $900 per month, for the two-bedroom apartments, as of the October 1, 2020 and October 1, 2021 valuation dates; and (ii) $850 to $1,050 per month, for the one-bedroom apartments, and $850 to $950 per month, for the two-bedroom apartments, as of the October 1, 2022 valuation date.  Plaintiff's expert further testified that the subject property's owner's representative explained that the apartment rents were not increased from the October 1, 2020 to October 1, 2021 because of the effects of the COVID pandemic.[5]

Paterson attempted to characterize plaintiff's expert's testimony that plaintiff "isn't a sophisticated property owner" as being equivalent to the subject property being poorly managed. However, the court does not find that the testimony and evidence support such a characterization. Paterson was afforded the opportunity to present "convincing evidence" to the court that the presumption should not apply to the subject property's actual rents because the leases were old or long-term, that the property was not well managed, or the rentals were below market rates. However, Paterson elected not to present any testimony or evidence in these matters.

In addition, Paterson offered no evidence that plaintiff failed to maximize the permissible

---

[4]  Information on the comparable apartment rents that were reviewed by plaintiff's expert were not contained in his appraisal report.

[5]  Plaintiff's expert was unable to explain why, if Paterson's rent control ordinance limited rent increases to five (5%) percent per year, certain rents reported on plaintiff's rent rolls increased by more than five (5%) percent between October 1, 2021 and October 1, 2022.  Although he speculated on how that could occur, he was unable to offer any tangible evidence.






rents under Paterson's rent control ordinance. Moreover, the court emphasizes that simply because a multi-family property owner may be inexperienced and choose to self-manage a property, does not, per se, render the property poorly managed. The taxing district bears the burden of presenting convincing evidence to the court of mismanagement. Here, no evidence was presented by Paterson that the subject property experienced an unusually high vacancy rate, that the property was not appropriately maintained, that the leases were old or long-term, or evidence of other market rent apartments.[6]

Therefore, the court finds that the apartment rents reported on the October 1, 2020, October 1, 2021, and October 1, 2022 rent rolls were economic or market rents. Accordingly, the potential gross income from the subject property's apartments was: (i) $100,800, as of the October 1, 2020 and October 1, 2021 valuation dates; and (ii) $107,700, as of the October 1, 2022 valuation date.

### 2. Retail units

To estimate the economic or market rent of the subject property's retail units, plaintiff's expert identified seven retail leases that he opined were comparable with the subject property.[7] The seven retail leases were identified in plaintiff's expert's appraisal report as follows:

---

[6] Cross-examination disclosed several missteps by plaintiff's expert in performing his appraisal, including, not having reviewed copies of the subject property leases, an unfamiliarity with the subject property's vacancies and collection losses, and an unfamiliarity with rent decontrols under Paterson's rent control ordinance. However, these missteps are not equivalent to Paterson offering convincing evidence that the subject property was mismanaged.

[7] On January 1, 2022, S&J Grocery Store executed a five-year lease agreement for one of the subject property's retail units at a fixed rate of $20.84 PSF. However, the retail unit was not exposed to the open market, S&J Grocery Store purchased the assets of the existing grocery store and approached plaintiff about entering into a new lease.






| Lease | Address | Lease date | Leased area | Rent PSF | Lease Type |
|---|---|---|---|---|---|
| 1 | 554 River Street Paterson, NJ | February 2020 | 900 sq. ft. | $16.00 | Modified gross |
| 2 | 162-164 W. Broadway Ave. Paterson, NJ | September 2020 | 650 sq. ft. | $22.15 | Modified gross |
| 3 | 207-209 McBride Ave. Paterson, NJ | February 2021 | 725 sq. ft. | $17.38 | Modified gross |
| 4 | 919-921 Main Street Paterson, NJ | May 2021 | 1,000 sq. ft. | $24.00 | Modified gross |
| 5 | 13-15 Fair Street Paterson, NJ | November 2022 | 1,904 sq. ft. | $20.17 | Modified gross |
| 6 | 446-464 Chamberlain Ave. Paterson, NJ | November 2022 | 3,050 sq. ft. | $21.24[8] | Triple net |
| 7 | 581 E. 18th Street Paterson, NJ | December 2022 | 1,100 sq. ft. | $21.82[9] | Modified gross |

Plaintiff's expert testified that, except for comparable lease 2, he confirmed the lease details with the listing agent/realtor or leasing representative. Moreover, except for the twenty (20%) percent upwards adjustment applied to comparable lease 6 to reconcile the difference in lease type, plaintiff's expert applied no other adjustments to any of the comparable leases.

Plaintiff's expert relied on leases 1, 2, 3, and 4, as of the October 1, 2020, and October 1, 2021 valuation dates, and leases 3, 4, 5, 6, and 7, as of the October 1, 2022 valuation date. Thus, the range of rents, as of the October 1, 2020 and October 1, 2021 valuation dates was $16.00 to $24.00 PSF, and as of the October 1, 2022 valuation date, was $17.38 to $24.00 PSF. Ultimately, plaintiff's expert concluded a market or economic rent of: (i) $21.00 PSF, as of the October 1, 2020 valuation date; (ii) $21.50 PSF, as of the October 1, 2021 valuation date; and (iii) $22.00 PSF, as of the October 1, 2022 valuation date.

---

[8] Plaintiff's expert testified that he misstated the lease type in his appraisal report as a modified gross lease, when it was a triple net lease. Consequently, he applied an upwards twenty (20%) percent adjustment to the rent to account for the expenses assumed by the tenant. Accordingly, the corrected rental rate was $21.24 PSF.

[9] Plaintiff's expert testified that the leased square footage and the rent per square foot was misstated in his appraisal report. Accordingly, he corrected the leased area to 1,100 square feet and the rental rate to $21.82 PSF.






However, an examination of the subject property's rents as of each valuation date is also warranted. Here, as of the October 1, 2020 valuation date, plaintiff's fast-food restaurant retail unit tenant was paying rent of $27.78 PSF, and the bodega/grocery store tenant was paying rent of $18.95 PSF, or a mean of $23.37 PSF. As of the October 1, 2021 valuation date, plaintiff's fast-food restaurant retail unit tenant was paying rent of $29.05 PSF, and the bodega/grocery store tenant was paying rent of $18.95 PSF, or an average of $24.00 per square foot. As of the October 1, 2022 valuation date, plaintiff's fast-food restaurant retail unit tenant was paying rent of $29.05 PSF, and the bodega/grocery store tenant was paying rent of $20.84 per square foot, or an average of $24.95 PSF.

i. Market or economic rent as of the
10/1/2020 and 10/1/2021 valuation dates

Plaintiff's expert relied on lease 1, lease 2, lease 3, and lease 4, to reach his conclusion of market or economic rent for the subject property as of the October 1, 2020 and October 1, 2021 valuation dates.

At the outset, the court must reject plaintiff's expert's comparable lease 2. Plaintiff's expert did not possess a copy of the lease, did not review the lease, and did not verify the terms of the lease, including its inception date, leased area, lease terms, or rental value with the landlord, landlord's attorney, tenant, tenant's attorney, or any brokers involved in the transactions. Thus, plaintiff's expert was unable to verify any of the lease terms with a transaction participant having personal knowledge. See VBV Realty LLC v. Scoth Plains Twp., 29 N.J. Tax 548, 565 (Tax 2017); N.J.S.A. 2A:83-1.

The court finds that the greatest weight and emphasis must be attributed to lease 4, as that is physically, locationally, and functionally most like the subject property. Lease 4 is located on






the corner of Main Street and Robert Street, a commercial and retail area in Paterson like the subject property's location on the corner of Broadway and Summer Street. It contains four retail units on the first floor and apartment units above the retail stores. Most importantly, lease 4 involved a use by a café/restaurant, like the subject property's fast-food restaurant tenant. No other comparable leases offered by plaintiff's expert involved restaurants. In addition, lease 1 was a first-floor retail area in a former single-family residence. Moreover, the court finds lease 3 is inferior to the subject property as it is a stand-alone one-story retail store located directly across from the Passaic River.

Accordingly, for the foregoing reasons and placing the greatest weight and emphasis on lease 4, the court finds that the economic or market rent that should be ascribed to the subject property's retail units, as of the October 1, 2020 valuation date should be $23.00 PSF, and as of the October 1, 2021 valuation date should be $23.50 PSF.

ii.   Market or economic rent as of the 10/1/2022 valuation date

Plaintiff's expert relied on lease 3, lease 4, lease 5, lease 6 and lease 7, to reach his conclusion of market or economic rent for the subject property as of the October 1, 2022 valuation date.

For substantially the same reasons expressed forth above, the court finds that lease 3 is not the compelling evidence of the subject property's economic or market rent. In addition, the court finds the location of lease 5 is inferior to the subject property. Lease 5 is located along Fair Street, a one-way street that runs perpendicular to Main Street. Thus, vehicular traffic along Fair Street is not comparable to the subject property. Although lease 6 is in a retail strip center at the corner of Chamberlain Avenue and Redwood Avenue with exposure similar to the subject property, it is located more than 1.7 miles from the subject property, in an entirely different area of Paterson.






Thus, although it is evidence of economic or market rent, the court does not find it to be the most credible evidence of the subject property's market rent. Lease 7 is a newly constructed mixed-use building with a retail unit on the first floor, thus, it shares some physical features like the subject property. However, lease 7 it is located on East 18th Street, a less busy roadway than Broadway Avenue. As stated above, only lease 4 involved a use by a café/restaurant, like the subject property's fast-food restaurant tenant and was in a location and building like the subject property's.

Accordingly, for the foregoing reasons and placing the greatest weight and emphasis on lease 4, the court finds that the economic or market rent that should be ascribed to the subject property's retail units, as of the October 1, 2022 valuation date should be $24.00 PSF.

b.      Vacancy and Collection Loss

Vacancy and collection losses are "usually estimated as a percentage of potential gross income, which varies depending on the type and characteristics of the physical property, the quality of its tenants, the type and level of income streams, current and projected market supply and demand conditions, and national, regional, and local economic conditions." Appraisal Institute, The Appraisal of Real Estate 478 (14th ed. 2013).

Plaintiff's expert applied a vacancy and collection loss factor of five (5%) percent to the subject property's reconstructed potential gross income. Plaintiff's expert reviewed the subject property's rent roll and consulted CoStar reports for vacancy rates of apartments in: Passaic County; Passaic County CoStar 1-3 star rated buildings, Passaic Urban Submarket and Passaic Urban Submarket CoStar 1-3 star rated buildings. In addition, plaintiff's expert consulted CoStar reports for vacancy rates of retail units in: Passaic County; Passaic County CoStar 1-3 star rated buildings, Passaic Urban Submarket and Passaic Urban Submarket CoStar 1-3 star rated buildings. Plaintiff's expert's analysis of those reports disclosed vacancy rates of between 1.06% to 3.08%






for apartments, and 1.30% to 4.97% for retail buildings. Accordingly, the expert concluded that a vacancy and collection loss factor of five (5%) percent was reasonable for the subject property.

The court finds plaintiff's expert's vacancy and collection loss factor is adequately supported in the trial record with evidence derived from market-based data. Therefore, the court will apply a vacancy and collection loss factor of five (5%) percent on the subject property's reconstructed operating statement for the 2021, 2022, and 2023 tax years.

        c.        Operating Expenses

The next step in the income capitalization approach is determination of the appropriate stabilized operating expenses. Operating expenses are the "periodic expenditures necessary to maintain the real property and continue production of the effective gross income, assuming prudent and competent management." The Appraisal of Real Estate, at 479.

When the actual operating expenses of a well-managed apartment complex are 'within normal operating limits,' they should be accepted and deemed representative of the marketplace. Parkway Vill. Apartments Co., 8 N.J. Tax at 441-42. Conversely, when the evidence discloses that a property's economic rents are market derived, but the actual expenses are outside of acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Twp. of Secaucus, 16 N.J. Tax 463, 467 (App. Div. 1996). That is not to say that every operating expense must be accepted, adjusted, or stabilized in its entirety. An appraiser may elect to accept those operating expenses that are reasonable and typical of industry norms, and reject those that are irregular, uncharacteristic, and anomalous. The use of "both actual and stabilized expenses is acceptable appraisal practice." Maple Court Associates Ltd. v. Ridgefield Park Twp., 7 N.J. Tax 135, 153 (Tax 1984); See also Rudd v. Cranford Twp., 4 N.J. Tax 236, 244 (Tax. 1982); Skytop Gardens Inc. v. Sayreville Bor., 3 N.J. Tax 187, 194-96 (Tax






1981).

Here, plaintiff's expert reviewed the subject property's actual operating expenses for the 2019, 2020, 2021, and 2022 tax years. In certain instances, plaintiff's expert accepted the subject property's actual expenses as customary and reasonable, however in others, plaintiff's expert arrived at different stabilized operating expenses.

To gauge the reasonableness of the subject property's expenses, plaintiff's expert compared the reported expenses to the operating expenses of three other mixed-use properties. The three properties were in Elizabeth (Union County), Belleville (Essex County), and Palisades Park (Bergen County). The three properties possessed between 4 to 36 apartments and had retail space ranging from 1,250 to 4,269 square feet. The reported expenses of the three properties ranged from the 2015 to 2020 tax years.

Plaintiff's expert's comparison of the subject property's expenses with the expenses of the three other properties revealed the following:

| Category | Subject property | Comparable 1 | Comparable 2 | Comparable 3 |
|---|---|---|---|---|
| Management (% of EGI) | 0.00% | 0.00% | 5.75% | 0.00% |
| Admin. (% of EGI) | 0.00% | 7.40% | 9.99% | 2.14% |
| Utilities (% of EGI) | 4.33% | 10.66% | 10.25% | 8.21% |
| Maintenance (% of EGI) | 6.53% | 23.80% | 13.73% | 11.26% |
| Insurance (% of EGI) | 6.13% | 4.93% | 3.77% | 3.29% |
| Sanitation (% of EGI) | 0.00% | 1.08% | 0.00% | 1.36% |
| Security (% of EGI) | 0.00% | 1.21% | 0.00% | 0.00% |
| Misc. (% of EGI) | 0.00% | 1.8% | 0.08% | 0.00% |
| Reserves (% of EGI) | 0.00% | 0.00% | 0.00% | 0.00% |
| Leasing Commission (% of EGI) | 0.00% | 0.00% | 0.00% | 0.00% |

In the plaintiff's expert's opinion, the following stabilized expenses should be deducted from the subject property's reconstructed effective gross income: (a) a management fee of 5%; (b) an administration expense of 2%; (c) utility expenses of 4.33%; (d) maintenance and repair expenses of 15%; (e) insurance expenses of 6.13%; (f) miscellaneous expenses of 1%; (g) reserves






for replacements of 2%; and (h) leasing commissions of 5% of the effective gross income attributable to the retail portion of the property.

The court accepts, as reasonable the subject property's actual utility expenses of 4.33%. In addition, the court accepts as credible, plaintiff's expert's stabilized expenses of: (i) maintenance and repair expenses of 15%; (ii) reserves for replacements of 2%; and (iii) leasing commissions of 5% of the effective gross income attributable to the retail units on the subject property. However, the court rejects plaintiff's expert's proffered stabilized management fee expenses, insurance expenses, administration expenses, and miscellaneous expenses.

The court's review of the insurance expenses of the three comparable properties discloses a range between 3.29% to 4.93% of effective gross income, with a median of 3.77% and a mean of 4.00%. However, the subject property's reported insurance expense of 6.13% of effective gross income are between 1.2% to 2.8% higher than the comparable properties. Plaintiff's expert offered no meaningful testimony to explain the disparity between the subject property's insurance expenses and the comparable properties. Accordingly, the court finds the subject property's insurance expenses are outside normal limits and will instead apply a stabilized insurance expense of 4% of effective gross income to the subject property's reconstructed operating statement.

In addition, a review of the management expenses for the three comparable properties discloses a range between 0% to 5.75% of effective gross income, with a median of 0% and mean of 1.91%. Here, the plaintiff self-manages the subject property and thus, reported incurring management expenses of 0% during each of the 2019, 2020, 2021, and 2022 tax years. Accordingly, after reviewing the subject property's actual expenses for management and the management expenses of the three comparable properties, the court finds that a management fee expense of 3% of effective gross income is reasonable.






Finally, the court's review of the subject property's administration and miscellaneous expenses reveal that they were 0% of the effective gross income during each of the 2019, 2020, 2021, and 2022 tax years. In addition, as stated above, the court has accounted for a repair and maintenance expense of 15% and management fee expense of 3%, which the court finds would account for certain administration and miscellaneous related expenses associated with the subject property. Therefore, the court concludes that the administration and miscellaneous expenses associated with operating the subject property should be stabilized at 2% of effective gross income.

       d.     <u>Capitalization</u>

Direct capitalization is a "method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." <u>The Appraisal of Real Estate</u>, at 491. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of true or market value.

Here, in deriving his capitalization rates, plaintiff's expert consulted investor surveys, personally available data, and employed the Band of Investment technique. The investor surveys are completed by market participants engaged in real estate financing transactions during given periods of time. The surveys are compiled by analytical firms and trade associations and organized into categories and sub-categories, including geographic location, property type, size, grade, value, loan amount, etc. This court has "sanctioned" the use of data collected and commercially published by analytical firms and trade associations, such as Real Estate Research Corporation ("RERC"), American Council of Life Insurance ("ACLI"), and PwC. By scrutinizing and "analyzing this data, in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity






dividend rates used by the appraisers." Hull Junction Holding, 16 N.J. Tax. at 83.

The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Id. at 80-81 (quoting Appraisal Institute, Appraisal of Real Estate, 467 (10th ed 1992)). In employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. at 279-80).

Here, plaintiff's expert reviewed the following: RERC - East Second Tier Retail Neigh/Comm; RERC - East Third Tier Retail Neigh/Comm; RERC - East Second Tier Apartment; RERC - East Third Tier Apartment; ACLI Retail Investment Bulletins; ACLI Apartment Investment Bulletins; PwC - National Apartment Institutional Grade; and PwC - National Strip Shopping Center Institutional Grade, data for the 3rd quarter 2020, 3rd quarter 2021, and 3rd quarter 2022 to assist him in developing his capitalization rates. In addition, plaintiff's expert testified that he conferred with a New Jersey regional bank loan officer.

Plaintiff's expert concluded the following base capitalization rates:

(i)     7.00% as of the October 1, 2020 valuation date (3.75% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.25% equity dividend rate[10]);

(ii)    7.00% as of the October 1, 2021 valuation date (3.50% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.50% equity dividend rate);

(iii)   7.80% as of the October 1, 2022 valuation date (5.25% interest rate, 60% loan-to-value ratio, twenty-five (25) year amortization period, and 8.75% equity dividend rate).

---

[10] During trial plaintiff's expert referred to these as Equity Capitalization Rates.

   

The court's review and analysis of the data reveals that, as of the October 1, 2020 valuation date: (i) the ACLI Bulletin for retail buildings reported interest rates from 2.97% to 4.02%, loan-to-value ratios of 44.74% to 59.50%, capitalization rates of 2.94% to 7.74%[11], and indicated equity rates of -0.59% to 9.15%; (ii) the ACLI Bulletin for apartment buildings reported interest rates from 2.86% to 3.74%, loan-to-value ratios of 29.19% to 59.33%, capitalization rates of 3.30% to 5.89%, and an indicated equity rate of 2.37% to 5.80%; (iii) PwC's Apartment National capitalization rates were 3.50% to 8.00%, with an average of 5.22%; (iv) PwC's Apartment Mid-Atlantic Region capitalization rates were 4.00% to 6.75%, with an average of 5.43%; (v) RERC's East Third-Tier Apartments equity dividend rates were 5.50% to 9.00%; and (vi) RERC's East Third-Tier Retail Neigh/Comm equity dividend rates were 7.80% to 11.50%. Notably, the ACLI Bulletin for apartments reported interest rates in New Jersey were 2.97%, indicated equity rates in New Jersey were 4.67%, interest rates in the NY-NJ-CT-PA region were 3.08%, and indicated equity rates in the NY-NJ-CT-PA region were 4.15%.

Accordingly, based on a review of the data and information, and consideration of plaintiff's expert's testimony, the court finds that as of the October 1, 2020 valuation date, a 60% loan-to-value ratio is credible, a twenty-five (25) year amortization period is reasonable, a 3.50% interest rate is more credible, and a 6.00% equity dividend rate is more credible and should be applied. Thus, the court concludes that a base capitalization rate of 6.004% should apply as of the October 1, 2020 valuation date.[12]

Additionally, the court's review and analysis of the data reveals that, as of the October 1,

---

[11] According to plaintiff's expert's appraisal report. Plaintiff's expert did not produce the original ACLI Bulletins, instead, he reproduced only select portions under self-created tables.
[12] 6.007% constant x .60 = 3.604% and 6.00% x .40 = 2.4% (3.604% + 2.4% = 6.004%).






2021 valuation date: (i) the ACLI Bulletin for retail buildings reported interest rates from 2.74% to 3.95%, loan-to-value ratios of 52.24% to 66.67%, capitalization rates of 4.21% to 9.29%, and indicated equity rates of 3.81% to 11.30%; (ii) the ACLI Bulletin apartment buildings reported interest rates from 2.60% to 3.60%, loan-to-value ratios of 33.00% to 63.58%, capitalization rates of 4.21% to 6.56%, and indicated equity rates of 3.50% to 8.42%; (iii) PwC's Apartment National capitalization rates were 3.00% to 7.00%, with an average of 4.59%; (iv) PwC's Apartment Mid-Atlantic Region capitalization rates were 4.25% to 6.50%, with an average of 5.03%; (v) RERC's East Third-Tier Apartments equity dividend rates were 5.00% to 9.00%; and (vi) RERC's East Third-Tier Retail Neigh/Comm equity dividend rates were 7.00% to 11.00%. Notably, the ACLI Bulletin for apartments reported interest rates in New Jersey were 2.74%, indicated equity rates in New Jersey were 4.28%, interest rates in the NY-NJ-CT-PA region were 2.87%, and indicated equity rates in the NY-NJ-CT-PA region were 3.81%.

Accordingly, based on a review of the data and information, and consideration of plaintiff's expert's testimony, the court finds that as of the October 1, 2021 valuation date, a 60% loan-to-value ratio is credible, a twenty-five (25) year amortization period is reasonable, a 3.25% interest rate is more credible, and a 6.00% equity dividend rate is more credible and should be applied. Thus, the court concludes that a base capitalization rate of 5.909% should apply as of the October 1, 2021 valuation date.[13]

Finally, the court's review and analysis of the data reveals that, as of the October 1, 2022 valuation date: (i) the ACLI Bulletin for retail buildings reported interest rates from 4.40% to 5.63%, loan-to-value ratios of 50.08% to 64.27%, capitalization rates of 4.87% to 8.72%, and

---

[13] 5.848% constant x .60 = 3.509% and 6.00% x .40 = 2.4% (3.509% + 2.4% = 5.909%).






indicated equity rates of 3.53% to 9.64%; (ii) the ACLI Bulletin apartment buildings reported interest rates from 4.40% to 5.08%, loan-to-value ratios of 26.38% to 62.54%, capitalization rates of 2.34% to 6.48%, and indicated equity rates of 0.90% to 5.90%; (iii) PwC's Apartment National capitalization rates were 3.00% to 8.00%, with an average of 4.75%; (iv) PwC's Apartment Mid-Atlantic Region capitalization rates were 3.75% to 6.50%, with an average of 4.70%; (v) RERC's East Third-Tier Investment Apartments office equity dividend rates were 5.00% to 9.50%; and (vi) RERC's East Third-Tier Retail Neigh/Comm equity dividend rates were 6.50% to 11.30%. Notably, the ACLI Bulletin for apartments reported interest rates in New Jersey were 4.40%, indicated equity rates in New Jersey were 3.88%, interest rates in the NY-NJ-CT-PA region were 4.59%, and indicated equity rates in the NY-NJ-CT-PA region were 3.53%.

Accordingly, based on a review of the data and information, and consideration of plaintiff's expert's testimony, the court finds that as of the October 1, 2022 valuation date, a 60% loan-to-value ratio is credible, a twenty-five (25) year amortization period is reasonable, a 5.00% interest rate is more credible, and a 6.00% equity dividend rate is more credible and should be applied. Thus, the court concludes that a base capitalization rate of 6.609% should apply as of the October 1, 2022 valuation date.[14]

Accordingly, the subject property's reconstructed operating statements for the 2021, 2022, and 2023 tax years are set forth below:

---

[14] 7.015% constant x .60 = 4.209% and 6.00% x .40 = 2.4% (4.209% + 2.4% = 6.609%).


Interpreter


ADA
Americans with Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



**2021 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments | | | $100,800 |
| Retail Units | 1,900 s.f. x. $23.00 P.S.F. | | $ 43,700 |
| TOTAL: | POTENTIAL GROSS INCOME | | $144,500 |
| LESS: | Vacancy & Collection Loss | @ 5% | ($ 7,225) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $137,275 |

EXPENSES:

| | | |
|---|---|---|
| Management | @ 3% of EGI | $ 4,118 |
| Administration/Misc. | @ 2% of EGI | $ 2,746 |
| Insurance | @ 4% of EGI | $ 5,491 |
| Utilities | @ 4.33% of EGI | $ 5,944 |
| Repairs/Maintenance | @ 15% of EGI | $20,591 |
| Replacement Reserves | @ 2% of EGI | $ 2,746 |
| Leasing commission | @ 5% of Retail EGI | $ 2,076 |
| TOTAL: EXPENSES | | ($43,712) |

NET OPERATING INCOME                                   $ 93,563

Base Capitalization Rate[15]                         6.004%

**2022 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments | | | $100,800 |
| Retail Units | 1,900 s.f. x. $23.50 P.S.F. | | $ 44,650 |
| TOTAL: | POTENTIAL GROSS INCOME | | $145,450 |
| LESS: | Vacancy & Collection Loss | @ 5% | ($ 7,273) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $138,177 |

EXPENSES:

| | | |
|---|---|---|
| Management | @ 3% of EGI | $ 4,145 |
| Administration/Misc. | @ 2% of EGI | $ 2,764 |
| Insurance | @ 4% of EGI | $ 5,527 |
| Utilities | @ 4.33% of EGI | $ 5,983 |
| Repairs/Maintenance | @ 15% of EGI | $20,727 |
| Replacement Reserves | @ 2% of EGI | $ 2,764 |
| Leasing commission | @ 5% of Retail EGI | $ 2,121 |
| TOTAL: EXPENSES | | ($44,031) |

NET OPERATING INCOME                                   $ 94,146

Base Capitalization Rate[16]                         5.909%

---

[15] Excludes Paterson's effective tax rate.
[16] Excludes Paterson's effective tax rate.






**2023 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Apartments | | | $107,700 |
| Retail Units | 1,900 s.f. x. $24.00 P.S.F. | | $ 45,600 |
| TOTAL: | POTENTIAL GROSS INCOME | | $153,300 |
| LESS: | Vacancy & Collection Loss | @ 5% | ($ 7,665) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $145,635 |

EXPENSES:

| | | |
|---|---|---|
| Management | @ 3% of EGI | $ 4,369 |
| Administration/Misc. | @ 2% of EGI | $ 2,913 |
| Insurance | @ 4% of EGI | $ 5,825 |
| Utilities | @ 4.33% of EGI | $ 6,306 |
| Repairs/Maintenance | @ 15% of EGI | $21,845 |
| Replacement Reserves | @ 2% of EGI | $ 2,913 |
| Leasing commission | @ 5% of Retail EGI | $ 2,166 |
| TOTAL: EXPENSES | | ($46,337) |

NET OPERATING INCOME $ 99,298

Base Capitalization Rate[17] 6.609%

To compute the overall capitalization rate that is to be applied to the net operating income, Paterson's effective tax rate for each year must be added to the base capitalization rate. Adding or "loading" Paterson's effective tax rate accounts for the real estate taxes being paid by plaintiff from operating the subject property.

Plaintiff's expert calculated Paterson's effective tax rate by multiplying Paterson's general tax rate by Paterson's Chapter 123 average ratio of assessed to true value for each year. Thus, plaintiff's expert calculated the following effective tax rates for Paterson:

(i)    3.413%, for the 2021 tax year (4.476% general tax rate x 76.25% = 3.413%);
(ii)   3.156%, for the 2022 tax year (4.642% general tax rate x 67.98% = 3.156%);
(iii)  2.910%, for the 2023 tax year (4.903% general tax rate x 59.35% = 2.910%).

However, the Director of the New Jersey Division of Taxation promulgates tables setting forth the effective tax rates for each taxing district in New Jersey. The Director's tables provide that Paterson had effective tax rates during the tax years at issue of the following:

---

[17] Excludes Paterson's effective tax rate.

 Interpreter

 ADA Americans with Disabilities Act

 ENSURING AN OPEN DOOR TO JUSTICE



       (i)       3.354%, for the 2021 tax year;
       (ii)     3.106%, for the 2022 tax year;
       (iii)    2.888%, for the 2023 tax year.

Importantly, the court emphasizes that application of plaintiff's expert's proposed effective tax rates or the Director's effective tax rates for the 2021 and 2022 tax years does not affect the outcome of the court's decision in the 2021 or 2022 tax appeal matters. The reason for this is that the resulting overall capitalization rate, concluded value, and the court's application of the ratio of total assessed value to true market value, reveals that the concluded values fall within Paterson's Chapter 123 common level range for both the 2021 and 2022 tax years.

| | Capitalization rate with plaintiff's expert's ETR | Capitalization rate with the Director's ETR | Concluded value with plaintiff's expert's ETR | Concluded value with Director's ETR | Ratio of assessed value to true value with plaintiff's expert's ETR | Ratio of assessed value to true value with Director's ETR |
|---|---|---|---|---|---|---|
| 2021 | 9.417% | 9.358% | $993,554.21 | $999,818.34 | 77.85%[18] | 77.36%[19] |
| 2022 | 9.065% | 9.015% | $1,038,566 | $1,044,326 | 74.48%[20] | 74.07%[21] |

For the 2021 tax year, Paterson's Chapter 123 ratio had an upper limit of 87.69% and lower limit of 64.81%. Thus, employing either plaintiff's expert's proposed effective tax rate or the Director's effective tax rate for the 2021 tax year results in a ratio of either 77.85% or 77.36%, which fall between Paterson's 2021 tax year upper limit and lower limit. Consequently, no reduction in the subject property's 2021 tax assessment is warranted. Therefore, the court will enter judgment under the 2021 tax appeal dismissing plaintiff's complaint with prejudice.

For the 2022 tax year, Paterson's Chapter 123 ratio had an upper limit of 78.18% and lower

---

[18] $773,500 / $993,554.21 = 77.85%.
[19] $773,500 / $999,818.34 = 77.36%.
[20] $773,500 / $1,038,566 = 74.48%.
[21] $773,500 / $1,044,326 = 74.07%.


Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE


limit of 57.78%. Thus, employing either plaintiff's expert's proposed effective tax rate or the Director's effective tax rate for the 2022 tax year results in a ratio of either 74.48% or 74.07%, which fall between Paterson's 2022 tax year upper limit and lower limit. Consequently, no reduction in the subject property's 2022 tax assessment is warranted. Therefore, the court will enter judgment under the 2022 tax appeal dismissing plaintiff's complaint with prejudice.

For the 2023 tax year, Paterson's Chapter 123 ratio had an upper limit of 68.25% and lower limit of 50.45%. Application of plaintiff's expert's effective tax rate for the 2023 tax year would result in an overall capitalization rate of 9.519%, and a concluded value of $1,043,156. Application of the Director's effective tax rate for the 2023 tax year would result in an overall capitalization rate of 9.497%, and a concluded value of $1,045,572. Here importantly, application of both plaintiff's expert's effective tax rate and the Director's effective tax rate would result in a ratio of either 74.15% or 73.98%, which fall outside of Paterson's Chapter 123 ratio for the 2023 tax year. Accordingly, a reduction in the subject property's 2023 tax year assessment is warranted.

However, neither plaintiff nor Paterson addressed the discrepancy between plaintiff's expert's calculation of the effective tax rate and the Director's calculation of the effective tax rate during trial. Therefore, the court will afford plaintiff and Paterson thirty (30) days from the date hereof to submit briefs and calculations of how the 2023 effective tax rate should be computed, including the proposed revised tax assessment for the subject property for the 2023 tax year.[22]

### III. Conclusion

For the reasons stated above, the court finds that adjustments to the subject property's 2021 and 2022 tax year assessments are not warranted. Therefore, contemporaneously herewith the

---

[22] Following receipt of any briefs and calculations, the court reserves the right to invite the Director of the Division of Taxation an opportunity to be heard on this issue.






court will enter judgments dismissing plaintiff's 2021 and 2022 complaints with prejudice.

However, the court does find that an adjustment to the subject property's 2023 tax year assessments is warranted. But the precise adjustment to the subject property's 2023 tax assessment cannot be finally determined at this time. Therefore, court will afford plaintiff and Paterson thirty (30) days from the date hereof to submit briefs and calculations of how the 2023 effective tax rate should be computed, including the proposed revised tax assessment for the subject property for the 2023 tax year.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.




